PATTERSON, Chief Justice,
for the Court:
On May 28, 1980, Mississippi Power & Light Company (hereinafter MP&L) filed its Notice of Intention to Change Rates with the Mississippi Public Service Commission (hereinafter Commission), for services on or after July 1, 1980. The proposed rates were designed to produce $68,786,000 in additional gross annual operating revenues for the projected test year ending on June 30, 1981. The Commission suspended *611 the effective dates for the change in rates and set times for public hearings. MP&L filed a refunding bond, pursuant to statute, which authorized it to place the proposed rates into effect. After extensive public hearings[1] the Commission on November 24, 1980, authorized new rates designed to produce additional gross operating revenues of $48,277,442 to MP & L.
Oh December 23, 1980, the Mississippi Legal Services Coalition (hereinafter Legal Services), the Attorney General on behalf of the State of Mississippi and on behalf of the electrical customers within the affected area, filed separate appeals in the Chancery Court of the First Judicial District of Hinds County. The appeals were consolidated for consideration and adjudication.
The Attorney General, the Cities of Jackson, Cleveland and Ruleville, the Town of Merigold and Hinds County, each filed petitions to intervene. Although the chancery court, in its capacity as an intermediate appellate court, permitted the Attorney General to participate in the appeal it nevertheless rescinded this order prior to final judgment, reasoning that the Attorney General was not a proper party. The court permitted the City of Cleveland to withdraw its petition to intervene and allowed the City of Jackson, the City of Rule-ville, Town of Merigold and Hinds County to intervene as parties.
The chancery court affirmed the rate increase granted by the Commission to MP & L, with the exception of a customer charge of $3.25, which was found to be not supported by substantial evidence, and remanded that issue to the Commission for further consideration. Presently, there is no appeal from that action.
The Attorney General appealed the chancellor’s denial of his motion to intervene. We held in State v. Miss. Pub. Serv. Com’n., 418 So.2d 779 (Miss.1982), that when an Attorney General has common-law powers, as in this state, he has the inherent right to intervene in all suits affecting the public interest when he has no personal interest therein. Accordingly, the motion of MP & L to strike the Attorney General’s assignments of error with respect to the merits of the rate case was overruled. The Attorney General, Legal Services and the City of Jackson have appealed from the final judgment of the chancery court. They assign as error the Court’s affirmance of the Commission’s:
1. Use of a projected test year as sponsored by MP & L for the determination of the company’s rate base and operating expenses in order to establish new electrical rate schedules in that it was not supported by substantial evidence, was contrary to the manifest weight of the evidence and also constituted an error of law;
2. Denial of accelerated amortization of the excess accumulated federal tax reserve was contrary to the manifest weight of the evidence and constituted an error of law;
3. Allowing MP & L to reclassify charitable donations as operating expenses for rate making purposes was not supported by substantial evidence and constituted an error of law;
4. Not excluding consolidated tax savings from MP & L’s company’s operating expenses for rate making purposes;
5. Granting MP & L comprehensive inter-period tax allocations constituted an error of law;
6. Inclusion of customer deposits and advances and MP & L’s rate base constituted an error of law;
7. Allowance of the entire amount of MP & L’s investment tax credits to be added to the company’s rate base was not supported by substantial evidence, was contrary to the manifest weight of the evidence and constituted an error of law;
8. Allowance of plant held for future use to be included in MP & L’s rate base was not supported by substantial evidence, was in excess of the statutory authority of the commission and also constituted an error of law;
*612 9. Inclusion of long term debt interest and preferred stock dividends as funds available to offset cash working capital requirements of MP & L was contrary to the manifest weight of the evidence and constituted an error of law;
10. Not rejecting the biased testimony of MP & L’s witness in favor of the unbiased testimony of the Commission’s expert witness;
11. Approving the acquisition adjustment of the purchase of Capital Electric Power Association by MP & L was not supported by substantial evidence, contrary to the manifest weight of the evidence and also an error of law;
12. Denial of accelerated amortization of excess depreciation reserve of MP & L constituted an error of law;
13. Permitted the amortization of the DeSoto County Plant Site Environmental Impact Study in arriving at the net utility operating income figure of $23,095,000 for the projected test year.
Legal Services urges two additional assignments of error:
1. The Court’s adoption of the approved rate increase by the Commission was unjust, unreasonable, and unreasonably discriminatory in the face of the overwhelming weight of the evidence and was not based on substantial evidence, in that it resulted in the disproportionate impact on impoverished ratepayers of MP & L;
2. The court’s approving the adoption by the Commission of the classification of residential consumers, which created regular residential, electric water heating and total electric classes, was unjust, unreasonable and unreasonably discriminatory.
MP & L supports and defends the Commission’s order insofar as it approved and allowed new rates and charges to produce $48,277,442 in additional gross annual operating revenues for the projected test year ending June 30, 1981. MP & L, however, argues the Commission erred in:
1. Not including construction work in progress (CWIP) in the rate base; and
2. Not finding MP & L had a cost of equity of 18%.
We consider MP & L as an appellee, except as to the above two assignments of error which we shall discuss at the conclusion of this opinion.
The decision of the Commission although affirmed by the chancery court on appeal was not unanimous. Commissioners Johnson and Snyder were of the opinion that a $48,277,442 rate increase was proper for a fair rate of return to MP & L and not unreasonable to its electrical consumers in the affected area. Commissioner Havens, although joining the majority in some aspects of the suit, was of the opinion that a $27,024,455 increase would afford a fair rate of return to the utility as well as being reasonable to the consumers.
The duties of the Commission are awesome and their responsibilities great in a most difficult, ongoing situation. Mississippi Code Annotated § 77-3-39 (1972), authorizes the Commission to establish rates that are just and reasonable to the ratepayers and which will yield a fair rate of return to the utility for its services. In effect the Commission is the counterpart of the market place by which other businesses are measured. This is so because public utilities are monopolies engaged in the business of furnishing necessary services to the public. Obviously, the legislative intent in creating the Public Service Commission was to interpose an authoritative body between the ratepayers of the utility and the investors in the utility so that their respective interests, necessarily antagonistic, might be equitably served. The crucible of the competitive public market place to which business concerns, other than monopolies, are necessarily exposed is thus avoided so that economic waste by overlapping and duplicating services will not occur.
The findings of the Commission are subject to appellate review by the Chancery Court of the First Judicial District of Hinds County and ultimately by this Court. The rate-making decisions are thereby passed from the initial authoritative Commission to the courts for review and judicial decision. *613 Unfortunately, the decisions are never final in the sense that utilities are subject to fluctuation of prices, inflation, vagaries of weather, business movement, and numerous other factors affecting their operations. These variables necessitate frequent applications for rate adjustments by the utilities for their very existence and this necessarily impinges upon the pocketbooks of the utilities’ subservient customers. In striving to lend stability to this ongoing balancing act between investors and consumers, the legislature has established a standard of just return to the utility and reasonable rates to the consumer. In Southern Bell T. & T. Co. v. Miss. Pub. Serv. Com’n., 237 Miss. 157, 238, 241, 113 So.2d 622, 654, 656 (1959), this was construed as follows:
The reasonableness or unreasonableness of the rates charged, or to be charged, by a public utility for its service or product is not to be determined by any definite rule or legal formula, and is not measurable with any great degree of exactness, but is a question of fact calling for the exercise of sound discretion, good sense, and a fair, enlightened, and independent judgment. In determining whether a rate is reasonable, each case must rest on its special facts. 73 C.J.S., 1032, Public Utilities, par. 25 a, and cases cited.

What appellant in this case is entitled to is “just and reasonable” rates which will yield “a fair rate of return” to the appellant upon the reasonable value of the property used or useful in furnishing service. A fair return is one which, under prudent and economical management, is just and reasonable to both the public and the utility. From the standpoint of the Company it is important that there be enough revenue not only for operating expenses but also for the capital cost of the business, which includes service on the debt and dividends on the stock. By that standard the return to the equity owner should be commensurate with returns on investments in other enterprises having corresponding risks and sufficient to assure confidence in the financial integrity of the business. What the public is entitled to demand is that no more be exacted from the rate payers than the services are reasonably worth. (Emphasis added).
The chancery court on appeal has limited authority. Mississippi Code Annotated § 77-3-67(4), (Supp.1982), provides in part:
The [Commission’s] order shall not be vacated or set aside either in whole or in part, except for errors of law, unless the court finds that the order of the commission is not supported by substantial evidence, is contrary to the manifest weight of the evidence, is in excess of the statutory authority or jurisdiction of the commission, or violates constitutional rights.
In Miss. Pub. Serv. Com’n. v. Miss. Power Co., 337 So.2d 936 (Miss.1976), the legal principles relating to the Commission’s authority in establishing rates were set out in some detail as was the authority of the chancery court and this Court on review in rate eases. We followed Tri-State Transit Co. of La. v. Dixie Greyhound Lines, 197 Miss. 37, 19 So.2d 441 (1944), stating: “The sole question presented for decision is whether or not the action of the commission was arbitrary, not supported by substantial evidence or was’ manifestly against the evidence.” 337 So.2d at 939.
We review this case with these principles in mind.
The first issue presented by the appellants is the propriety of a projected test year used by the Commission in arriving at the rate base for the utility. If its utilization is not supported by substantial evidence then its employment by the Commission was arbitrary. •
In approving or rejecting a proposed rate increase it is necessary for the Commission to have an identified time period in which operating expenses and revenues of the utility can be measured with the greatest accuracy and reliability. The Commission therefore requires[2] the utility proposing a *614 rate change to submit with its application its expenses and revenues based upon (1) an actual operating statement (historical test year); (2) pro forma operating statement (historical test year adjusted for known changes); and (3) a pro forma operating statement showing estimates of revenues and expenses (projected test year).
The application for the rate change by MP & L apparently stated the above requisites, however, the Commission did not require and MP & L did not substantiate the reasonableness or worth of the projected test year by substantial evidence in our opinion. Indeed the Commission[3] had considerable doubt concerning its use of the projected test year stating:
The Company proposes a projected test year for rate base and revenue operating results. Section 5 of the Notice reflects these results for the projected test year ending June 30, 1981. The Commission realizes the difficulty in evaluating the evidence relied upon in the development of a projected test year since, in some instances, it is based on forecasts which do not provide the same level of documentation and potential for review as is available in an historical test year. In this case, however, the Company has developed a pro forma historical year as a further test of the results to be derived from the new rates. These results are contained in Section 4 of the Notice. The Commission’s staff witnesses based their analyses on an average historical year rate base compared with actual operating results which were adjusted for known and measurable changes.
The Commission finds that the form of capital structure and the form of rate base consistent with said structure, as recommended by the staff witnesses are appropriate and should be accepted in most instances. However, the Commission further finds that the staff’s recommendations where appropriate should be made applicable to the Company’s projected test year results. This is consistent with the principles previously recognized by this Commission and the Mississippi Supreme Court with regard to use of a projected test year. We shall continue to evaluate the appropriateness of utilizing a projected test year in each case. However, current inflationary pressures, the fact that rates are made for the future, and the need to assure that future service requirements are met by the Company, require that in this instance the projected test year be utilized as the basis for application of the staff witnesses’ recommendations. This finding is further supported by the fact that the Company furnished results on a pro forma historical year as a further test of its projected year.
The Commission’s reasoning in adopting the projected test year was partially based upon the misplaced notion that this Court has authorized, apparently exclusively, the use of a projected test year in determining rate base. While it is probably true we have considered rate cases in which a projected test year was utilized, the issue as such has never been previously isolated by an assignment of error for adjudication by this Court. Since this is so, we must review the evidence before the Commission in determining whether it erred in this case. The methodology engaged by the Commission to determine rate base is of course not decided by legal dogma but rather lies within the Commission’s authority. The appropriate formula or method for the determination must be selected by the Commission through the exercise of sound discretion and independent judgment in evaluating the evidence of the utility demonstrating such formula’s suitability for rate making purposes under the circumstances then existing. Southern Bell T. & T. Co. v. Miss. Pub. Serv. Com’n., 237 Miss. 157, 113 So.2d 622 (1959); Federal Power Com’n. v. Hope, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944); Bluefield Co. v. Pub. Serv. Com’n., *615 262 U.S. 679, 43 S.Ct. 675, 67 L.Ed. 1176 (1923).
As stated the Commission has the authority and necessarily the duty to employ the formula it thinks best to determine the rate base. However, the utility seeking change has the burden of proof to establish the need for the increase so that it may obtain a reasonable rate of return upon the value of its assets for the services rendered as well as the burden of substantiating its reasonableness to the consumer. Miss. Pub. Serv. Com’n. v. Miss. Power Co., 337 So.2d 936 (Miss.1976). We are of the opinion this burden includes substantial evidence that the formula adopted for use in calculating rates is reasonable and best suited for such determination.
In support of the use of the test year witness Lubow testified the projection developed by him was based on an actual forecast of MP & L. He was of the opinion this approach eliminated some problems inherent in using historic periods because the projections are based upon a forecast of normal conditions and do not include out-of-period or abnormal events which always appear in definitive historical periods. He suggested a projected year more closely approximates utility operations as they will exist in the period when the proposed rates become effective. He admitted, however, that projections based upon forecasts, projections upon projections, are difficult to evaluate or verify because they do not provide the level of documentation and accuracy afforded by the use of a historic period.
Commission witness, Weiss, corroborated the testimony of Lubow in the difficulties encountered in evaluating and verifying the projected test year. He found virtually every projection and forecast in MP & L’s test year difficult, if not impossible, to verify and evaluate. Several requests, all overlooked or ignored, were made of MP & L to furnish schedules indicating how the forecast compared with the actual data for the first quarter of the test year. Although the data was available, the information was not furnished to the Commission until after the close of the hearing. It indicated that MP & L had grossly overestimated its operating expenses for the three months in question. These events provoked comment from Commissioner Havens who stated in dissent:
In my opinion, the use of the historic test .year rather than the projected test year is usually far more reliable....

Further, MP & L failed to produce evidence in its direct or rebuttal testimony or by way of exhibit which would establish a prima facie case for a projected test year.
For these reasons, I feel that MP & L failed to meet the burden of proof required by law and the majority is mistaken in accepting the speculative projected test year and its attendant figures.. ..

It would be difficult for me to believe that MP & L has not carefully examined the results that have occurred since the rate increase became effective. It would be equally difficult for me to believe that MP & L would not have attempted to enter such results in the record if they had substantiated the filing which MP & L made. Since MP & L failed to provide the Commission staff with the requested information on the actual results in the projected test year, I must construe the failure as evidence against the accuracy of the projected test year.
We think the great weight of the evidence supports Commissioner Havens’ conclusions. We do not find substantial evidence by MP & L to support the Commission’s adoption of the projected test year for rate making purposes. While we do think that MP & L’s records could be accepted as prima facie proof for rate making purposes, we do not believe the projected figures, which themselves rest upon a forecast, are entitled to such recognition. The results are based upon a formula more speculative than others and were substantially eroded by comparison with the results of the first three months of actual use. The employment of the projected test year under the existing circumstances was, in our *616 opinion, arbitrary inasmuch as it was not supported by substantial evidence.
Appellants next contend the Commission’s denial of an accelerated amortization of excess accumulated federal tax reserve was contrary to the manifest weight of the evidence and was an error of law.
As a result of the Revenue Act of 1978, which provided the corporate income tax rate commencing with 1979 would decrease from 48% to 46% for taxable income in excess of $100,000, MP & L has an excess accumulated tax reserve of approximately $1.8 million. The funds without question are composed of customer contributed capital. This tax reduction has caused the balance to be excessive in that more deferred taxes have accrued in the past than will be needed in the future. Since the funds are no longer needed for payment of taxes the question becomes how the excess should be returned to the ratepayers.
Staff witness Weiss and Legal Services witness Taubman, testified the reserve maintained by MP & L was excessive and should be returned to the ratepayers whose remittance had created the reserve. Weiss was of the opinion it should be returned over a two year period and Taubman suggested an immediate refund or credit. However, MP & L witness Lubow, testified both suggestions should be rejected.
The testimony of MP & L and its arguments have been substantially rebutted by the Attorney General. Witness Lubow contended that it would be speculative and unrealistic to presume some permanent tax savings as a result of the change in the federal income tax rate. The record refutes this however, as the lowering of the tax rate, first from 52% to 48%, and then to 46% at present demonstrates a downward trend in corporate income taxes. Lubow next argued the adjustment proposed was not permissible under generally accepted accounting principles. However, as stated by the court in Alabama-Tennessee Natural Gas Co. v. Federal Power Com’n., 359 F.2d 318, 336 (5th Cir.1966), “accounting for tax purposes ... may be valuable tools, but they cannot dictate ratemaking policies.” See also Public Systems v. Fed. Energy Reg. Com’n., 606 F.2d 973 (D.C.Cir.1979). Somewhat similarly he contended that a letter from the Federal Power Commission required MP & L to amortize the excess tax reserves at the same rate as the original tax rate. This letter, dated August 20, 1977, was well in advance of the 1979 tax reduction and therefore is of no value in the determination of this issue. Lubow next stated that the adjustment that Weiss suggested had been rejected in several other jurisdictions. Nevertheless, the Attorney General directs our attention to many other jurisdictions which have adopted such a procedure. It should also be noted that the Commission, in the recent 1981 Mississippi Power Company utility case, adopted this exact procedure for accelerated amortization of excess tax reserves.
Finally, Lubow contended the adjustment would endanger the company’s tax benefits for accelerated depreciation in that the Internal Revenue Service could rule this adjustment constituted a flow through of benefits which is prohibited by Internal Revenue Code § 167(1). MP & L did not introduce, nor do we find that the Internal Revenue Service has issued such a letter ruling even though the accelerated amortization of the excess tax reserves by public service commissions has been regularly occurring since 1979.
In following witness Lubow’s reasoning, the Commission stated:
While it is the desire of the Commission to carefully consider any reasonable or proper “flow-through” adjustment which may benefit the rate payer, care must be given to adhere to present tax laws and regulations and the possible effect of any such adjustment on the tax reserves so accumulated.
The rebuttal testimony offered by the Company supports the' position that to adopt “flow-through” adjustment recommended by the staff witness could jeopardize the entire Company reserve accumulated for deferred income taxes. Further, such an adjustment has been denied in other jurisdictions and at this time, *617 until the issue is finally settled, the Commission is unable to accept this recommendation.
Commissioner Havens, disagreeing with the majority, reasoned the excess funds should be returned as soon as practical so the present customers who were primarily responsible for the reserve accounts would be assured of obtaining at least part of their money in return. Havens suggested that four years would be an appropriate period in which to amortize the excess funds.
After review of the evidence concerning the issue, we are of the opinion the Commission’s order is not supported by substantial evidence. If the excess funds were returned over a twenty year period as the Commission directs, many taxpayers would never receive any return on the excess they have paid. It is appropriate we think that the ratepayers receive the benefit of this overaccrual since they provided the deferred taxes in paying for the utilities’ services. We are of the opinion this issue should be remanded to the Commission for a determination of the appropriate method and time by which the excess will be returned to the ratepayers who contributed to the excess reserve.
Appellants next contend the Commission erred in permitting MP & L to reclassify charitable donations as an operating expense of the utility for rate making purposes.
In allowing MP & L to reclassify $284,000 in donations as an operating expense, the Commission relied upon United Gas Corp. v. Miss. Pub. Serv. Com’n., 240 Miss. 405, 127 So.2d 404 (1961), in which we held reasonable donations could be considered proper operating expenses. The Commission admits United Gas Corp. should perhaps be reexamined during this age of soaring costs.
Upon reconsideration we are of the opinion this item can no longer be justified as a proper operating expense of a utility. In United Gas Corp., the Commission excluded donations totaling $2,707 in 1957 and $1,136 in 1958. Obviously circumstances have drastically changed since 1961 when the cost of utility service was relatively inexpensive and moreover, the argument was not then advanced that the donations of a utility might include charities, or other recipients, not satisfactory to the ratepayers. We are cognizant of the importance of such contributions to the donees and the public relation benefits that result to the utility from such but, nevertheless think in the present economy future customers should not be burdened with this cost, however small.
We are of the opinion the Commission did not err in this ease by relying on United Gas Corp. because it authorizes such. However, we opine further that such contributions should not be considered an essential cost of conducting the business of a public utility in other cases in the future.
Appellants contend the Commission erred in not excluding consolidated tax savings from MP & L’s operating expenses. The question is whether the Commission, in determining just and reasonable rates for MP & L, made a proper adjustment for federal income taxes in calculating the Company’s cost of service.
The record reveals in the years 1978 and 1979 MP & L realized $3.2 million in federal income tax savings by filing a consolidated tax return with its parent and sister companies. Staff witness Weiss recommended a reduction in the historical test year submitted of operating expenses of $3.2 million. MP & L contended the savings resulted from the issuance of short term debt by the parent company from which MP & L had received no capital contribution and therefore no reduction should be made. Weiss rebutted this contention, testifying although MP & L received no capital contribution, the issuance of such debt was a regular procedure and did not change the fact that MP & L had received an allocation of the tax savings. MP & L conceded its savings had averaged over $1.5 million for each of the six years prior to 1979.
The Commission’s order did not address this contested issue. It seems the Commis *618 sion, by adopting MP & L’s projected test year which did not include the tax savings, gave no consideration to the benefits flowing from the consolidated return. MP & L’s tax expense was thereby computed on the basis of a projected separately filed return which was in fact never actually filed.
We therefore are of the opinion the Commission erred in allowing MP & L to claim tax expenses based upon a hypothetical federal income tax liability calculated for a separate return. We suggest to the Commission in ruling on this issue the reasoning in City of Muncie v. Pub. Serv. Com’n., 177 Ind.App. 155, 378 N.E.2d 896, 898-99 (1978), wherein the Indiana Court held:
[T]he Commission cannot arbitrarily allow a tax expense computed on the basis of a separate tax return when such a return was not actually filed. This does not mean that the expenses and revenues of affiliated companies must be attributed to Petitioner for rate-making purposes. Rather, it means that some determination must be made as to the tax savings accruing to Petitioner as a result of its participation in the filing of a consolidated federal income tax return. In this manner, a more accurate computation of Petitioner’s actual federal income tax liability can be made.

We feel that by automatically assuming a tax rate of 48%, without any determination of the effective tax rate, and without any determination of the properly allowable income tax expense, the Commission is allowing an additional, hidden return on capital to the shareholders at the expense of the rate-payer. Furthermore, our research indicates that at least thirteen other jurisdictions have reached the same conclusion on this issue.1 (Footnote omitted).
It is our opinion the Commission erred in permitting a hypothetical tax expense to be included in the operating expenses of the utility when the evidence reveals MP & L’s participation in the consolidated tax return inexorably reduced its income tax liability.
Upon remand, we think the Commission should make some determination of such tax saving and proportionately reduce its operating expenses by this amount.
Appellants complain that the Commission erred in granting MP & L comprehensive inter-period tax allocation not required by federal statute or regulation.
It is conceded that normalization of tax savings arises as a possibility when a utility experiences tax benefits generated by timing differences between the accounting method used for tax purposes and the method used for rate making purposes. The Commission allowed MP & L, who was already normalizing the tax savings resulting from the use of accelerated depreciation as required by federal law, to extend its tax normalization to include tax provisions associated with injury and damage reserve, debt portions of allowance for funds used during construction income, capitalized taxes, donations and costs of removal.
Staff witness Weiss and Legal Services’ witness Taubman urged the Commission to utilize “flow through” of tax benefits contending “normalization” created a hypothetical tax expense to be incurred by present ratepayers. MP & L offered substantial evidence to the effect that such allocation was required under the Federal Energy Regulatory Commission Uniform System of Accounts and further:
[AJbsent comprehensive interperiod tax allocation, utility service is priced below its actual cost. Subsidies are thus created for current ratepayers at the expense of future customers.
... [T]ax normalization treatment is an integral component of proper utility rate-making in that it achieves the equitable distribution of costs over the life of an asset and provides proper price signals in the consumption of electric energy.
As noted by the Attorney General, MP & L, and the Commission, there appears to be reasons both for and against the use of “normalization” versus “flow-through.”
The record establishes that there was presented to the Commission a choice *619 of policy as to which method to employ. The method chosen (normalization) appears to be in accord with the practice of a number of other regulatory agencies. Under the accepted principles of judicial review, we cannot say that the determination of the Commission in regard to this issue was unreasonable nor arbitrary, but rather was supported by substantial evidence.
The Commission’s refusal to deduct customer deposits and advances from MP & L’s rate base for the projected test year in the amount of $9,809,000 is urged by appellants as an error of law.
Appellants contend that since these funds are not supplied by the utilities’ investors, MP & L should not be allowed to earn a return on them. The Attorney General contends the expenses associated with customer deposits and advances (i.e., interest) should properly be classified as an operating expense and thus deducted from the rate base. Weiss testified it was his understanding that interest expense for customer deposits is charged as an operating expense (above-the-line accounting entry). However, MP & L asserts interest on customer deposits is in fact charged as an expense to shareholders (below-the-line accounting entry) not to customers. Since they are not cost-free items, MP & L argues the Commission acted correctly in not deducting an amount equal to customer deposits and advances from the rate base. We agree.
In Miss. Pub. Serv. Com’n. v. Miss. Power Co., 366 So.2d 656, 661 (Miss.1979), we held:
The Commission omitted from the rate base it established, if otherwise correct, customer deposits which have been held by us to be a part of the debt of a public service corporation, (citation omitted) These should be included in the rate base anticipated on this remand.
See Miss. Pub. Serv. Com’n. v. Miss. Valley Gas Co., 327 So.2d 296 (Miss.1976).
We are of the opinion, that in line with the above cited cases the Commission was correct in not excluding these items from MP & L’s rate base. The Commission’s refusal to deduct an amount equal to customer deposits and advancements from the rate base is supported by substantial evidence and does not constitute an error of law.
Appellants next contend the Commission erred in allowing the entire amount- of MP & L’s investment tax credits to be added to the company’s rate base.
The investment tax credit, originally introduced in the Revenue Act of 1962, permits an eligible utility to receive a “tax credit” of a specified percentage of the cost of the utility’s investment in certain new qualified capital investments against the utility’s current income tax liability. This Act, which did not expressly specify rate making treatment of the tax credit by state or federal regulatory commissions was amended in 1962 by expressly prohibiting federal regulatory agencies from using the tax credit to reduce federal income taxes as a component of cost of service, but applied no such bar to state regulatory commissions. Therefore, between 1962 and 1969, when the investment tax credit was terminated, state regulatory commissions were free to decide the appropriate treatment of tax savings resulting from the investment tax credits.
In 1971 the investment tax credit was reinstated as the Job Development Investment Credit. The Revenue Act of 1971 restricted a utility from sharing the benefit of the tax credit and indirectly restricted the authority of the state regulatory commission to share the benefits of the credit with its consumers.
It is not contended that the post-1971 tax credit should have been deducted from MP & L’s rate base, rather appellants argue that pre-1971 tax credits should have been deducted.
The Commission urges that the determination of whether to deduct pre-1971 investment tax credits from the rate base lies within their discretion and that they exercised such when they ordered “accumulated deferred investment tax credit will not be deducted from rate base based on certain interpretations of current income tax laws and regulations.”
*620 As stated in Miss. Pub. Serv. Com’n. v. Miss. Valley Gas Co., 327 So.2d 296, 297 (Miss.1976),
It is true that on appeal the findings of the public service commission are considered prima facie correct and the appellate court will not substitute its judgment for that of the commission, provided substantial evidence exists to support its findings or its findings are not manifestly against the weight of the evidence.
We must therefore examine the evidence for a proper determination of this issue.
Weiss, testified that a “certain portion” of accumulated deferred investment tax credits which he later identified as pre-1971 tax credits should be excluded from the rate base as customer-contributed capital under the “prudent invéstment theory.” On cross-examination it became apparent that he had included post-1971 job development investment tax credit along with pre-1971 credit in the amount to be deducted from the rate base in that category for a total of $17,120,450. Weiss then recommended this figure should be reduced .by any amount representing post-1971 job development investment tax credit and stated that although he did not know how much was post-1971, if MP & L would provide the amount, he would make the proper adjustment. This information was not furnished so Weiss estimated the 13 month average pre-1971 investment tax credit and deducted $2,602,447 rather than $17,120,450.
No evidence was introduced to indicate that such a deduction was forbidden by the income tax laws. We are of the opinion that because the Commission denied the pre-1971 investment tax credit deduction based upon “interpretations of income tax laws and regulations” and the testimony does not reflect that income tax laws forbid such a deduction, the Commission’s finding was not supported by substantial evidence. We therefore reverse and remand this issue for a determination of whether pre-1971 credit can properly be included in the rate base.
Appellants next assert the Commission erred in permitting plant held for future use to comprise a part of MP & L’s rate base.
The Commission included $3,150,000 for plant held for future use in MP & L’s rate base stating that “[b]ecause this Commission has in the past gone on record in recommending the acquisition and development of such plant, we approve its inclusion.”
In South Hinds Water Company v. Mississippi Public Service Commission, 422 So.2d 275 at 283 (Miss.1982), we noted that “[a] public utility company is entitled to a fair return only upon the value of such of its property as is useful and being used in service for the customers’ benefit,” and found, “if the property will be employed within a reasonable time, and if the utility’s management can show a definite plan as to how the property will be employed for public service, then the property’s value may be included in the rate base.”
The only evidence presented to justify its inclusion in this case consisted of a schedule of three sites for future generating stations listing only their location and monetary amount and testimony to the ill effects on the investors if this rate base request was denied.
We are of the opinion that because MP & L failed to produce evidence of how and when the property would be employed, as was the case in South Hinds Water Company, the Commission erred in allowing the inclusion of plant held for future use in the rate base.[4] This is not to say that on remand, under proper proof, that this item cannot be approved.
Appellants contend the Commission erred in excluding long term debt interest and *621 preferred stock dividends from funds available to offset MP & L’s cash working capital requirements.
Wilson, testifying for the Commission, expressed his opinion that long term debt interest and preferred stock dividends should be included in the calculation of cash working capital, but MP & L disagreed, explaining as follows:
As part of the regulatory process this Commission will determine a rate of return which compensates the Company’s investors for the use of their capital. This return as earned becomes available to investors who have discretionary control over the use of such funds. That is, the Company’s earnings may be used to pay dividends, to reduce debt, or to reinvest in utility construction projects. Because these earnings are associated with investor capital, interest expense and preferred stock dividends are recorded by the Company on a so called below the line basis for accounting and rate making purposes. Therefore, these components of non-operating income should necessarily be excluded from the determination of utility cash working capital.
The Commission accepted the staff’s utilization of a lead and lag study to support its cash working capital requirement but adjusted it, with other adjustments, to exclude long term debt interest and preferred stock dividends as expense items.
The chancery court found the adjustments made by the Commission to be “amply supported by the evidence in the record,” and further held,
The matter of the exclusion by the Commission of the long term debt interest and payment of stock dividends from the lead and lag study was a judgment call by the Commission and left the cash working capital well within the formula approved by FERC which would have provided for the higher amount that the company had asked for. No error here by the Commission.
We are of the opinion the order of the Commission should be affirmed as to the exclusion of long term debt interest and preferred stock dividends from cash working capital under the following rationale:
Interest on long-term debt is not a cost-of-service expense but rather a below-the-line item that must be paid out of corporate earnings. As such the funds in these accounts constitute corporate funds which belong unconditionally to the pipeline and the stockholders and, thus, Florida Gas cannot be required to utilize them, without remuneration, as working capital for the benefit of the consumers. These accruals differ markedly from such items as prepaid purchased gas or accrued federal income taxes which are paid by the consumer as part of the rates for the sole purpose of meeting those expenses. Re Florida Gas Transmission Co., 93 PUR3d 477, 489 (Fed.Power Com’n.1972).
The Attorney General assigns as error the Commission’s rejection of the unbiased testimony of staff witness Weiss in favor of the alleged biased testimony of MP & L witness Lubow. It is contended the Commission had a legal obligation to adopt the findings of its expert witness in that Weiss’ position was analagous to a master at equity. We are of the opinion this argument is without merit.
In Southern Bell T. & T. Co. v. Miss. Pub. Serv. Com’n., 237 Miss. 157, 228-29, 113 So.2d 622, 649 (1959), this Court stated:
The Commission is the tryer of facts in a rate case; and in its consideration of the various elements that are generally considered in determining the rate base, it is within the province of the Commission to determine the weight to be given to the evidence, the reliability of the estimates and opinions, and the credibility of the witnesses. There is nothing in the law that compels the Commission to accept the opinion evidence of the Company’s employees as proof of the reasonable value of the Company’s property for rate-making purposes, if, in the opinion of the Commission, that evidence is conjectural, unrealistic and unreliable.
See also Miss. Pub. Serv. Com’n. v. Miss. Power Co., 337 So.2d 936 (Miss.1976).
*622 The same rationale would hold true for an expert that the Commission hired to help evaluate the need for a rate increase. Since the Commission is the sole judge of the credibility of the witnesses they were free to accept and/or reject recommendations of any of the witnesses, including Weiss. We therefore affirm on this assignment.
Appellants next assert the Commission erred in approving the acquisition adjustment[5] to operating expenses of the purchase of Capital Electric Power Association by MP & L.
The Commission allowed an adjustment of $3,631,992 to be amortized at the rate of $181,000 per year for the 20 years remaining life of the facility. Appellants contend there was no proof offered by MP & L to justify either the price in excess of the book value paid or that the plant and physical assets of Capital Electric Power Association would benefit all MP & L customers. Lu-bow, testifying for MP & L, stated:
While this amount has not been included as part of utility rate base, the recovery of such costs through customer rates over its service life is a properly includible electric operating expense as the acquisition was made for the benefit of all customers served by the Company both before and after the acquisition of the additional territorial area.
An exhibit to his testimony indicated that the original cost of the property was $11,-345,776 and deducted therefrom the accumulated depreciation and contribution in aid of construction leaving the original cost less depreciation of $7,533,506. Therefore, the acquisition adjustment above the cost of the property is $3,631,992.
Witness Weiss, unaware the Commission had previously approved the acquisition by MP & L, thought for rate making purposes, payment in excess of the book value of the plant was not a prudent investment. Therefore, he contended the acquisition adjustment should not have been allowed.
Our research reveals that public utilities amortization of acquisition adjustment is a proper component of cost of service and should be included as a proper operating expense when proven by the utility to be beneficial. We are cognizant of the fact that two witnesses had diametrically opposed views on this issue. Weiss argued such a purchase was not prudent in the context of rate-making purposes and Lubow contended the acquisition of the plant and its physical assets was for the benefit of all MP & L customers. We cannot say that the Commission, being responsible for authorizing such purchases by utilities as the one above, erred in this determination.
Appellants next contend the Commission’s denial of the accelerated amortization of the excess depreciation reserve maintained by MP & L was error.[6]
One of the recommendations made to the Commission by Weiss was that they order the accelerated amortization of an excess depreciation reserve maintained by MP & L. Weiss stated:
[Theoretical reserve studies were performed on the Company’s plant-in-service as of December 31, 1974 and December 31, 1978. These studies reveal the pres *623 ence of excess depreciation reserves in the amounts of $7,799,000 and $20,945,-000, respectively. This means that as of December, 1978, the Company has collected almost $21,000,000 in excess depreciation expenses from its customers. This $21 million represents a capital contribution made by the customers and for which the Company pays no interest expense. There is no basis upon which the Company should be permitted to continue using these funds.
Weiss recommended these funds be returned to the ratepayers over the anticipated two year life of the rates resulting from this proceeding.
Weiss testified he received his information from annual MP & L reports to the Federal Energy Regulatory Commission which Legal Services now contends would have to be considered conclusive evidence of the facts which MP & L put in the report. The report which Weiss relied upon states:
In the year 1979 a study was made by Ebasco Services, Inc. of the Company’s depreciable electric plant in service as of December 31, 1978. The study indicated the Company’s Reserve for Depreciation is in excess of reserve requirements at December 31,1978 in the amount of $20,-945,230. The Company has elected to amortize this excess over the remaining life of each functional group, reducing the annual depreciation for each function as follows:
Production 0
Transmission 147,000
Distribution 547,000
General 103,000
797,000
In rebuttal, Soper (the project manager of Ebasco in charge of the studies which identified the amount of the MP & L depreciation reserves) testified that the remaining life method of amortization of the excess depreciation was generally accepted by most regulatory bodies. Soper testified that procedures used for rate-making purposes should be as close as possible to the utility’s normal accounting procedures and by varying such, abnormalities in the projected test year might result. Lubow also opined the adjustments made by Weiss were in direct conflict with generally accepted accounting principles.
The Commission concluded the two year depreciation proposed by Weiss did not follow basic depreciation methods. They were also of the opinion Weiss erred in not considering the production plant depreciation along with transmission, distributing and general plant distribution.
Commissioner Havens discussed what he decided should be done about the depreciation reserve in his dissent stating:
The Commission heard extensive testimony from both the staff and the Company as to the treatment of the $20.9 million which had accumulated as excess depreciation reserve and the excess amount in the deferred tax reserve, and I am of the opinion that these excess reserve amounts should be returned to ratepayers in a time frame which is between that suggested by the staff and Company witnesses. The Company recommended that these amounts be amortized over the remaining life of the asset, and the Commission witness Weiss recommended amortization over a two-year period.
As mentioned previously in this Dissent, it is my belief that each of these excess reserves should be returned to the ratepayers as soon as possible. A four-year period of amortization of the excess reserves would be equitable to the ratepayers and also to the Company and is, I feel, a reasonable compromise of the two positions. These adjustments have the effect of reducing the net income received by the Company to $25,566,436.
It is clear several different views were expressed as to how and when this excess reserve should be returned to MP & L customers. However, we are of the opinion the Commission’s order is not supported by substantial evidence. The rationale on this issue is the same as we expressed in regard to the accelerated amortization of the excess accumulated federal tax reserve. We agree with Commissioner Havens that the excess should be returned as soon as *624 reasonably possible to the ratepayers and therefore, we remand to the Commission for a determination of an appropriate time frame in which the excess should be returned. Rates of a utility, in our opinion, may be predicated only upon such operating expenses supported by substantial evidence as are actual and necessary. This necessitates consideration by the Commission of this issue on remand.
Appellants assert the Commission erred in permitting the amortization of the DeSoto County plant site environmental impact study in arriving at the net utility operating income figure of $23,095,000 for the projected test year.
The record indicates this study was done pursuant to an order of the Commission in 1977. It requested MP & L to begin immediate plans for at least one new coal fired electric generating facility to be built due to the unusual weather conditions in Mississippi which were causing a demand for increased electricity at an unprecedented rate.
MP & L offered proof that the study resulted in a determination the plant would not be needed until at least the early 90’s. Although the plans to construct the new plant have not been abandoned entirely, it is now of insignificant value. Lubow testified the cost of the study was $1,717,325 and requested that MP & L be allowed to amortize it over two years as a cost of service. The Commission’s order held:
The amortization of the DeSoto County plant site environmental impact study is supported by the weight of the testimony, but consideration will be given this matter at the time the DeSoto County plant is constructed.
Commissioner Havens, in his dissent, agreed the Company should be allowed to amortize the cost but concluded MP & L did not support the amortization by the weight of the evidence.
Appellants first argue the Commission’s order was inconsistent in that it appears they intended not to amortize this amount through the income statement but rather treat it as construction work in progress. The Commission asserts that although the language of their order is not clear they did not intend to include the adjustment which is clearly shown by their adoption of MP & L’s figure of $23,095,000. The Commission now contends what they meant by their order (“but consideration will be given this matter at the time the DeSoto County plant is constructed”) was that an adjustment will be made as to plant cost by a decrease in cost to reflect the adjustment made at the present time. Therefore, this argument is without merit.
As to the amortization not being supported by substantial evidence, as contended by appellants and Commissioner Havens, we note all three Commissioners agreed that the cost of the study should be amortized. Since the evidence discloses MP & L’s capacities do not require a new plant to be built at this time, it would be unreasonable and unjust to penalize the Company by not allowing them to recoup the costs of a project the Commission ordered to be conducted. We are therefore of the opinion the Commission should be affirmed as to this issue.
Legal Services urges two additional assignments of error. First, it is asserted the order of the Commission adopting the approved rate increase was unjust, unreasonable and discriminatory in that it resulted in a disproportionate impact on the impoverished ratepayers of MP & L.
Legal Services argues that Mississippi has the lowest income per capita in the United States, and if MP & L gets the rate increase requested, it would put their rates in the top 25% of the nation. Witness after witness testified concerning how the rate increase would impact upon the poor and the elderly.
Like all the other questions presented- by this appeal, this issue cannot be decided in total isolation. The customers’ ability to pay is a factor that must be considered in determining the reasonableness of the increase rate which is ultimately granted by the Commission. The Commission addressed this issue stating:
*625 In addition to the above mentioned evidence, this Commission heard meaningful and sobering testimony from public witnesses on fixed incomes, senior citizens, others identified as being below the poverty line, and representatives of such persons. The impact of any increase in the cost of electric service on such persons was given serious consideration by this Commission.
In Southern Bell T. & T. Co. v. Miss. Pub. Serv. Com’n., 237 Miss. 157, 113 So.2d 622, we held a public utility is entitled to a fair return measured by a consideration of what is just and reasonable to both the public and the utility.[7] Although we recognize that the customer’s ability to pay is a vital factor to be considered by the Commission in setting rates for a utility, we agree with MP & L’s argument and the Commission’s finding that it is a factor to be considered with other facts and is not paramount nor controlling. Telluride Power Co. v. Public Utilities Com’n., 8 F.Supp. 341 (D.C.Utah, 1934). The record reveals the Commission heard extensive testimony from public witnesses and the Commission’s order clearly indicates such factors were given serious consideration. Therefore, we hold the Commission’s order was not unjust, unreasonable nor discriminatory in this regard.
Second, Legal Services contends the Commission’s approval of three classes of residential consumers in the rate charged by MP & L is error.
In following its past pattern, MP & L classified residential consumers into three classes: regular residential, electric water heating and total electric. These rates, which reflect a summer winter differential proportionately applicable to each class, result in cheaper rates for useage by the total electric consumer, which Legal Services submits is unlawful.
Miss.Code Ann. § 77-3-33 (1972), states in part:
(3) Such utility may employ in the conduct of its business suitable and reasonable classifications of its service, patrons, rates, deposits and service charges. The classification may, in any proper ease, take into account the nature of the use, the quantity and quality used, the time when used, the purpose for which used, and any other reasonable consideration.
From this we note that classification of consumer rates is not discriminatory per se. The question seems to be whether the rate charged by MP & L to the three classes of residential consumers comports with the standard of reasonableness required by statute.
Schimpf, Director of Rates for MP & L, testified why MP & L classified consumers into three categories and why rates for a total electric consumer are less expensive:
Normally a total electric home can be served by MP & L with no additional investment cost. Facilities are sized and built to serve air conditioning for summer peak loads. Any additional margin that the company receives during the off season or the winter period is margin that would otherwise not have been produced were the customer not total electric. Now since this margin goes to satisfy a portion of the revenue requirements of the company it represents revenue that will not have to come from other customers. In this way all customers of the company receive a benefit from the winter season sales that are made to total electric customers. And the overall level of rates is reduced from what it would have been. The same is true of electric water heating customers. Since water heaters use more energy in the off peak, or winter season, in the same way as *626 electric heating customers, total electric rate is certainly not discriminatory. It is available to any customer who.requests service and has the required appliances. In addressing this issue, the Commission’s
order stated:
The Commission finds that the Company is moving toward straight rates for residential service. The Commission feels strongly, and the evidence at the hearing supports the conclusion, that flat rates are desirable, especially for senior citizens and low income consumers of this state, which groups are primarily low usage customers. For this reason, the Company should give serious consideration to a rate structure involving straight or flat rates on residential rate schedules as soon as possible.
Within the next several months, this Commission intends to hold generic hearings on structure and design of rates, and pending these hearings and the conclusions drawn therein, the Commission will approve the rate design proposed by the Company in its Notice, but with the understanding that such approval is of a temporary nature.
Although conceding they have not gone far enough, the Commission found, and we agree, that the classification proposed by MP & L is reasonable in that it is based upon the type and quality of service furnished, i.e., totally electric customers usually receive a larger quantity and the cost of such service is less expensive because of the greater quantity used. Although we think the Commission should continue to consider straight or flat rates for residential consumers we cannot say, from the evidence, that their action in approving the continuance of these classifications was unreasonable, arbitrary or capricious.
MP & L assigns as error the Commission’s failure to allow construction work in progress (CWIP) in the amount of $19,412,-000 in the rate base.
Two major factors were advanced by MP & L for inclusion of CWIP in the rate base: (1) during the projected test year $27,478,-000 in CWIP will become completed and (2) all the CWIP proposed will become used or useful during the projected test year. MP & L offered evidence that the customer benefits from such because a sustained construction program assures each customer of continued reliable electric service and future rate base depreciation and tax cost will be lowered.
This issue was addressed in United Gas Corp. v. Miss. Pub. Serv. Com’n., 240 Miss. 405, 426, 127 So.2d 404, 412 (1961), wherein this Court stated:
When the work is completed and the plant is put into service, its entire cost, including interest, taxes and other overhead, is capitalized. Hence the Commission concluded, correctly we think, that the company could suffer no injustice by the exclusion of such construction from the rate base. It also noted that a substantial portion of the construction work was designed for new customers, and, if the item were placed in the rate base, the additional revenue produced should be considered; otherwise existing customers would have to pay a return on property construction for future customers. United offered no evidence as to its anticipated revenues from this construction. The exclusion of this item from the rate base is well established. Mississippi Southern Bell Case, supra, 237 Miss, at 208-210, 236 [113 So.2d 622]; Ark. Power and Light Co. v. Ark. Public Serv. Comm., 226 Ark. 225, 289 S.W.2d 668, 14 PUR (3d) 38 (1956).
We are of the opinion the Commission did not err in excluding CWIP from the proposed rate base. As MP & L contends it would lower future rate base depreciation and tax costs which would benefit future customers as opposed to existing customers. It must also be noted that although MP & L presented evidence as to what percentage of the CWIP would be “used or useful” during the test year, they did not show what percentage would be used or useful during any given time during the test year. Therefore, the Commission found the inclusion of these projects would *627 not reflect the actual expenditures, and it appears to us this was correct. Had MP & L proven what percentage would go “online” during what particular months of the year, and made the appropriate adjustments, the Commission’s order seems to indicate this amount could properly have been included. We are of the opinion that since MP & L did not meet its burden of proof concerning this issue, the Commission was correct in denying its inclusion in the rate base.
MP & L contends the Commission erred in not' accepting Dunn’s testimony that MP & L’s cost of equity is 18%, and in not applying that figure to Dr. Legler’s capital structure, which was used by the Commission and is accepted by MP & L.
The Commission’s order recites:
This Commission has evaluated the testimony of Mr. Dunn and finds that it cannot accept a cost of capital which is based on a cost of equity at 18%. When considered in the light of the other testimony introduced in this cause, the comparable returns generated by the electric utility industry are not at the 18% return on common equity as contained in Mr. Dunn’s testimony. The Commission finds that there are certain subjective judgments contained in the analyses of Mr. Dunn which result in a cost of equity in excess of that which is realistic based on current conditions....
On the other hand, the staff witness, Dr. John B. Legler, presented thorough and comprehensive testimony with regard to an appropriate capital structure for the Company and a cost of equity for his conclusion on the Company’s cost of capital. Dr. Legler agrees with Mr. Dunn that the cost of equity to utilities has risen during the last several years but does not agree that it is as high as the Company’s witness suggests. Dr. Legler used two methods to estimate the cost of equity capital: (1) applications of finance theory, and (2) allowed and earned returns comparison. The applications of finance theory considered are the bond yield plus risk premium method, and the dividend yield plus growth (DCF) method. First, Dr. Legler developed cost rates for the capital components of debt, preferred stock, and common equity. He then developed an appropriate capital structure and lastly developed the overall cost of capital by applying the component cost rates to his adopted capital structure. The Commission finds that the capital structure recommended by the staff witness Legler to be more appropriate to develop an overall cost of capital for the Company ....

Although the increase in revenues which is allowed to the Company in this order of $48,277,442 is substantially lower than that sought by the Company, the Commission finds that the substantial evidence in this record supports a conclusion that these additional revenues will produce a rate of return sufficient to enable the Company to attract capital, to maintain its financial integrity, to cover its increased cost and provide for future adequate and dependable electric service to its customers and service areas. Further, the aforesaid level of revenues will permit the Company to maintain its coverages for the issuance of additional capital to provide adequate and dependable electric service.
After careful review we find this determination by the Commission is supported by substantial evidence, is not contrary to the manifest weight of the evidence and is not in excess of statutory authority of the Commission. Therefore, the Commission’s determination to reject a cost of equity of 18% is affirmed.
THE OPINION OF THE CHANCERY COURT ON APPEAL IS AFFIRMED IN PART AND REVERSED IN PART AND REMANDED TO THE PUBLIC SERVICE COMMISSION FOR APPROPRIATE PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION.
WALKER and BROOM, P.J., and ROY NOBLE LEE, BOWLING, HAWKINS, DAN M. LEE, PRATHER and ROBERTSON, JJ., concur.

. Consisting of 35 volumes, 4219 pages.

. See MPSC Rules and Regulations Governing Public Utility Service, Rule 7, Application to *614 Adjust Rates (1980).

. Commissioner Havens dissented rejecting the projected test year.

. In South Hinds Water Company, we held: “The land in question was a couple of vacant lots in south Jackson, and there was no evidence produced as to when the land would be placed into public service, nor was there any precise indication of a proposed use. In the absence of such evidence, it was proper to exclude the value of the land from the rate base total.” At 283.

. In 1 A. Priest, Principles of Public Utility Regulation 75-76 (1969), an example of acquisition adjustment is given:
There is a sharp conflict over the propriety of amortizing, out of operating expenses, the difference between the bona fide, arm’s length purchase price of utility property and the “original cost” of that property, i.e., its cost to the person who first devoted it to public use. Company A, engaged in an expansion program approved by the regulatory agencies which supervise it, believes that the public interest will be served if it acquires the properties of Company B. But B is not required to sell and A cannot condemn its facilities. After hard, strenuous trading, A agrees to buy and B to sell at a price $300,000 in excess of B’s original cost. That excess or difference is an “Acquisition Adjustment.”

. This excess differs from the excess accumulated federal tax reserve discussed previously in that the depreciation reserve is set aside for the depreciation of assets of the Company. When the tax rate was reduced, this resulted in an overfunding of the accumulated depreciation reserve.

. Miss.Code Arm. § 77-3-33(1) (1972), states: No rate made, deposit or service charge demanded or received by any public utility shall exceed that which is just and reasonable. Such public utility, the rates of which are subject to regulation under the provisions of this article, may demand, collect and receive fair, just and reasonable rates for the services rendered or to be rendered by it to any person. Rates prescribed by the commission shall be such as to yield a fair rate of return to the utility furnishing service, upon the reasonable value of the property of the utility used or useful in furnishing service.