OPINION OF THE COURT
Bellacosa, J.
The policy of the New York Public Service Commission (PSC) authorizing utilities to pass along to ratepayers part of the cost of corporate charitable contributions is challenged on First Amendment grounds under the United States Constitution. We agree with the result in the lower courts on the merits declaring the policy unconstitutional. The order of the Appellate Division should thus be affirmed. This court also previously affirmed, at the threshold pleadings level, the determination that the PSC policy constituted State action (Matter of Cahill v Public Serv. Commn., 128 Misc 2d 510, affd 113 AD2d 603, affd 69 NY2d 265, reorg denied 69 NY2d 862, cert denied 484 US 829). That, of course, is the law of the case and sets the stage for the merits review here.
Prior to 1970, the PSC, as the State agency charged with plenary regulatory and rate-fixing powers over all public utilities in New York State (Public Service Law § 66 [12]; § 91 [1]; § 92 [1]; § 97 [1]), did not allow recoupment from ratepayers of corporate sums given as charitable donations. These costs, in the millions of dollars, were absorbed within the particular utility’s shareholder cost columns. In 1970, the PSC changed its policy and allowed reimbursement from customers *109 through the authorized rate structure, and thus transformed these costs into and treated them as utility operating expenses. Appellants New York Telephone (NYTel) and Rochester Gas & Electric (RG&E) took advantage of the PSC’s empowerment and sought retrieval of costs expended as contributions to numerous charities, including politically and religiously active organizations.
Cahill is a customer of appellant NYTel and of another utility which was a former intervenor in this case. His article 78 proceeding against the PSC and the utilities attacks this forced funding, through these publicly regulated corporate conduits, (1) of organizations engaged in activities and causes contrary to his political or personal beliefs; (2) of religious institutions that expound beliefs inconsistent with his own; and (3) of organizations that promote the right to abortion, to which he is opposed on moral and religious grounds. The Attorney-General also brought article 78 proceedings against the PSC and certain utilities seeking the same relief on behalf of all ratepayers. The proceedings were consolidated and are here as of right only by NYTel and RG&E, the PSC having shifted to a mute stance before this court.
Cahill’s First Amendment argument springs from his personal sense of real and perceived compulsion under the PSC policy effecting his contribution to and association with groups which advance beliefs contrary to his own and which are selected unilaterally and unrestrictedly by the utilities. The Attorney-General advances essentially the same argument on behalf of consumers generally.
The First Amendment protects the right to speak and to associate freely, as well as the right not to speak or associate. The Supreme Court, almost 50 years ago, extolled people’s rights under the First Amendment freedom from governmental interference with speech or association activities (Board of Educ. v Barnette, 319 US 624, 633). There, the First Amendment rights of pupils, Jehovah’s Witnesses who refused to salute the flag, were upheld through the inspiring voice of Justice Jackson, whose opinion for the majority of the court stated, in part: "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein. If there are any circumstances which permit an exception, they do not now occur to us.” (Id., at 642.)
*110 Almost 40 years later, the Supreme Court met a man who objected to the New Hampshire motto "Live Free or Die” on his license plate (Wooley v Maynard, 430 US 705). The State argued that the motto served the State’s interest by promoting an appreciation of history and State pride. The court, harkening to Barnette (319 US 624, supra), protected the licensee’s First Amendment freedom from participation in the dissemination of his State’s ideological message on his license plate (see also, Elrod v Burns, 427 US 347; Buckley v Valeo, 424 US 1).
Only a month later, the Supreme Court weighed the validity of a Michigan statute that permitted "agency shop” agreements under which nonunion employees had to pay the union a fee equal to union dues (Abood v Detroit Bd. of Educ., 431 US 209). Observing that the First Amendment is implicated in such circumstances because "[a]n employee may very well have ideological objections to a wide variety of activities undertaken by the union in its role as exclusive representative” (id., at 222), the court concluded nonetheless that interference with the employees’ association rights was "constitutionally justified by the legislative assessment of the important contribution of the union shop to the system of labor relations established by Congress.” (Id., at 222.) The policies of labor peace and no "free riders” led the court to hold the fee a qualifiedly permissible intrusion on the nonunion employees’ First Amendment freedoms. For the first time, constitutional dispensation was accorded to an unimagined "exception” niche — to use Justice Jackson’s word in Barnette — in the First Amendment pantheon. Even so, Abood narrowly restricted itself to fees used to finance expenditures by the union only for the purposes of collective bargaining, contract administration and grievance adjustment (431 US, supra, at 225-226). The court critically distinguished union expenditures for political or ideological purposes unrelated to collective bargaining, reasoning that compulsory political contributions "work[ ] no less an infringement of [the objecting employees’] constitutional rights” than do prohibitions against such contributions (id., at 234). It then invoked Thomas Jefferson’s ringing alarm that " 'to compel a man [or woman] to furnish contributions of money for the propagation of opinions which he [or she] disbelieves is sinful and tyrannical’ ” (431 US, supra, at 234-235, n 31). To the extent that fees extracted from those who objected to the union’s ideological viewpoint were used for political purposes, they were resoundingly condemned unani *111 mously, with the plurality opinion expressing the rationale that this was violative of the First Amendment unless the activities were "germane to [the union] duties as collective-bargaining representative” (431 US, supra, at 235).
Justice Powell issued the most extensive concurring opinion and agreed with the result more directly by stressing that the extracted payments for objectionable union expenditures could not withstand the traditional highest level of First Amendment scrutiny — paramount State interest. Justice Powell challenged the coerced service fees imposed on nonunion employees as so serious an impingement of First Amendment freedoms that he lamented the plurality’s failure to utter the more exacting level of scrutiny as controlling (id., at 254-255).
This abridged precedential array provides a sufficiently relevant dispositional context in which to examine the two principal arguments advanced by the utilities in this case. They argue that the First Amendment freedom reflected in the pertinent cases is not available because ratepayers will never be personally identified with the ideological positions expressed through the charitable donations and entities selected by the utilities. Alternatively, they argue that even if First Amendment rights are implicated, the intrusion is minimal and should be measured against something less than a compelling or paramount State interest. They claim the "germaneness” proviso of Abood predominates, is satisfied, and controls the outcome in their favor.
We conclude that the critical inquiry starts with whether the extracted payments could reasonably be regarded by the individual ratepayer as an affirmation of or acquiescence in beliefs of the benefited organizations, some of which beliefs happen to be anathema to the objecting ratepayer. The essence of the First Amendment impingement, as we have come to understand its modern nuanced application, is that the ratepayers are entitled to protection against forced financial support for causes and messages personally distasteful to them, because that would render those individuals faithless to their own beliefs. The monetary support here is direct, though small in amount, because it is spread across the entire rate-paying public (Teachers v Hudson, 475 US 292, 305-308). Thus, the first prong of the utilities’ rationalization for its PSC-authorized actions is far too cramped. It is enough that the extracted payments impose on the ratepayers, in some measure actually and in their estimation subjectively, particular *112 and objectionable expressions and causes of a host of organizations.
In Abood (431 US 209, supra), it was unlikely that the public would attribute to the nonunion employees the ideological or political views advanced by the union merely because of the nonunion members’ compelled financial support of the union. Yet, the constitutional canopy covered the employees if they viewed the compelled contribution as an endorsement of the union’s nonessential public causes (id., at 222). The parallel in the instant case is more potent. Here, ratepayers are powerless against governmentally regulated monopolies and have no place else to seek indispensable public utilities services. By that unique circumstance, they are more seriously burdened and disadvantaged than the contributing nonunion members in Abood (see, Matter of Cahill v Public Serv. Commn., 69 NY2d, supra, at 272-273). In assessing the infringement on the ratepayers’ freedoms, we may at least agree that while it may not be "sinful”, it is surely "tyrannical”, and that should be enough, with all the factors present here, to extend the First Amendment canopy (Abood v Detroit Bd. of Educ., 431 US, supra, at 234-235, n 31; see also, Austin v Michigan Chamber of Commerce, 494 US —, 110 S Ct 1391; Gaebler, First Amendment Protection Against Government Compelled Expression and Association, 23 BC L Rev 995, 1016-1023).
The utilities’ contingent argument that a First Amendment intrusion may be justified, in any event, by something less than a compelling State interest is an artful proposition. Did the Supreme Court in Abood displace the compelling State interest test — the traditional strict scrutiny standard by which First Amendment intrusions are measured — with a "germaneness test”? We do not think it did. But if it did, the utilities urge, an intrusion "germane” to some State interest will be justified and will pass constitutional muster here.
Without question, the Supreme Court plurality in Abood built its rationale first on some identified governmental interest. Only then did Justice Stewart inject the germaneness facet in his differentiated analysis of the permitted intrusion on the nonmembers’ First Amendment freedoms (see also, Ellis v Railway Clerks, 466 US 435, 455-456). In this case, therefore, no one can doubt that there is an obligation to present some sufficient State interest justifying the govern-mentally enforced retrieval of contributions from ratepayers. *113 It must even be germane to the reasonable cost of doing business and to the provision of utility services. Only then can the cost be ultimately chargeable to ratepayers instead of to the corporation itself and its shareholders. The "germaneness” notion is thus inextricably interwoven into the analysis of whether the State has established some government interest and is not a substitute for a State interest component (see, Cantor, Forced Payments to Service Institutions and Constitutional Interests in Ideological Non-Association, 36 Rutgers L Rev 3 [1983]). That is as far as the Supreme Court majority in Abood found it necessary to go as of that time.
Recently, in Austin v Michigan Chamber of Commerce (494 US —, 110 S Ct 1391, supra), the Supreme Court applied the compelling State interest standard in upholding the Michigan Campaign Finance Act, which prohibits corporations from using corporate treasury funds for independent political expenditures, and required instead that separate, segregated funds be used for such expenditures. The court held the statute was narrowly tailored to further the compelling governmental interest of eliminating distortion caused by corporate spending while permitting spending of segregated funds in a way that accurately reflects contributors’ support for a corporation’s political views (see, 494 US, at —, 110 S Ct, at 1398).
In light of the recent Supreme Court pronouncement in Austin and consistent with our understanding of Abood, we believe appellants are required to demonstrate a compelling State interest — the traditional First Amendment prerequisite. The tendered State interest in this case does not qualify. The germaneness aspect, so heavily leaned on by the utilities, in any event fails to bridge the gap because the nexus between the coerced recoupment of contributions and the provision of the utility services is too tenuous, or at least not proven with necessary definitiveness. We agree and understand that charitable contributions may enhance important quality of life aspects in selected spheres of the affected communities, thus benefiting in many intangible ways the utilities’ employees, customers and boosters. The lineup of amici curiae supporting the position of the utilities in this case are a testament to that desideratum. But the effects of this gossamer civic goodwill on the elementary provision of utility services are at best speculative, and at worst clearly not a sufficient basis upon which to compromise First Amendment freedoms held by so many affected persons.
*114 In sum, the utilities have not fulfilled their burden of justification for imposing on their ratepayers, rather than on their shareholders, the bill for their selected philanthropy. Indeed, the beneficial corporate public relations generated by the largesse made in the name of public utilities essentially advances predominately the private interests of the utility corporations and their shareholders — especially their financial interests — and are too peripheral to the service interests of the ratepayers. As we have stated previously in another context, "nothing in the Constitution requires that the shareholders get a free ride on the backs of the ratepayers” (Matter of Consolidated Edison Co. v Public Serv. Commn., 66 NY2d 369, 372).
Finally, the utilities protest that ratepayers’ objections to compelled recoupment of charitable contributions is no different from objections raised by taxpayers obliged to financially support ideologically offensive programs directly effected by the government. As troublesome and controversial as governmental expenditures may be in their fiscal and policy implications, they are very different from what we are confronted with in this case. To be sure, the government may collect and spread benefits — even ones highly offensive to some citizens— through the entire tax-paying society. But this cannot form a constitutional predicate for the government to go the next gigantic step and delegate this unique power to publicly regulated enterprises, especially corporate utility monopolies, and to allow them to extract across-the-board ratepayer subsidies.
The doctrinal integrity of First Amendment jurisprudence must be protected from such governmental channelling or blockading of public expression through preferred agents, who then, as in this case, exert monolithic or majoritarian power through a mini-taxing authorization certainly against the interests and beliefs of some ratepayers. This would convert the free marketplace of ideas to the consumer-subsidized preserve of corporate utility ideas.
Accordingly, the order of the Appellate Division should be affirmed, with costs.