755 A.2d 1192

IN RE PETITION OF NEW JERSEY–AMERICAN WATER CO., INC.,
FOR AN INCREASE IN RATES FOR WATER AND SEWER
SERVICE AND OTHER TARIFF MODIFICATIONS.

Superior Court of New Jersey
Appellate Division

Argued April 18, 2000—Decided July 21, 2000.

Before Judges SKILLMAN, NEWMAN and FALL.

*Andrew K. Dembia*, Deputy Ratepayer Advocate, argued the cause for appellant Division of the Ratepayer Advocate (*Blossom A. Peretz*, Ratepayer Advocate, attorney; *Ms. Peretz*, of counsel; *Mr. Dembia, Robert J. Brabston* and *Debra F. Robinson*, on the brief).

*Carla Vivian Bello*, Senior Deputy Attorney General, argued the cause for respondent Board of Public Utilities (*John J. Farmer, Jr.*, Attorney General, attorney; *Andrea M. Silkowitz*, Assistant Attorney General, of counsel; *Ms. Bello*, on the brief).

*William D. Lavery, Jr.*, argued the cause for respondent New Jersey–American Water Co. (*Cozen & O'Connor*, attorneys; *Mr. Lavery* and *David R. Oberlander*, on the brief).

The opinion of the court was delivered by

SKILLMAN, P.J.A.D.

The Division of Ratepayer Advocate (Ratepayer Advocate) appeals from the part of a final decision of the Board of Public Utilities (BPU), which allowed respondent New Jersey–American Water Company (American Water) to include fifty percent of its charitable contributions in the operating expenses used to determine the rates it charges customers for water and sewer service.

American Water provides water and sewer service to approximately 346,000 customers in 117 municipalities throughout New Jersey. American Water also sells water for resale to various municipalities, authorities and public utilities.

On January 12, 1998, American Water filed a petition with the BPU for permission to increase its rates. The matter was referred to the Office of Administrative Law, and an Administrative Law Judge (ALJ) conducted a lengthy evidentiary hearing in which testimony was presented by American Water, the Ratepayer Advocate and various other interested parties. One of the Ratepayer Advocate's objections to the rate increase petition was that American Water should not be allowed to treat any portion of its charitable contributions as operating expenses. The ALJ concluded that "this is a policy decision that only the [BPU] can make" and "commend[ed] to the [BPU] this issue as one deserving of further consideration on a generic basis."

When the BPU reviewed American Water's petition, it decided to adhere to its policy of allowing public utilities to treat a portion of their charitable contributions as operating expenses. The BPU also concluded that American Water's overall revenue requirement was $242,013,783. Accordingly, it allowed the company to increase its total revenues by 5.71%. The $49,593 of charitable contributions American Water was allowed to include in its operating expenses represent slightly more than two hundredths of one percent of its overall revenue requirements (.0205%). Consequently, the average residential consumer of water pays approximately eight cents more per year as a result of the inclusion of a

portion of American Water's charitable contributions in its operating expenses.

On appeal, the only part of the BPU's final decision the Ratepayer Advocate challenges is the allowance of fifty percent of American Water's charitable contributions as operating expenses. The Ratepayer Advocate argues that this ruling was incorrect because charitable contributions are not germane to the operation of a public utility. The Ratepayer Advocate also argues that the BPU violated the First Amendment to the United States Constitution and Article I, paragraph 6 of the New Jersey Constitution by allowing American Water to treat charitable contributions as operating expenses, because this compels ratepayers to indirectly finance charitable activities that some ratepayers may find objectionable. We reject both arguments and affirm the BPU's final decision.

I

The BPU has been vested with "broad discretion" in the exercise of its rate making authority. *In re Public Serv. Coordinated Transp.*, 5 *N.J.* 196, 214, 74 *A.*2d 580 (1950). Thus, the BPU's decisions "are entitled" to "presumptive validity," *In re Jersey Cent. Power & Light Co.*, 85 *N.J.* 520, 527, 428 *A.*2d 498 (1981), and will not be disturbed unless a utility or other interested party can show an abuse of discretion. *In re New Jersey Power & Light Co.*, 9 *N.J.* 498, 508, 89 *A.*2d 26 (1952).

In *New Jersey Bell Tel. Co. v. State Dep't of Pub. Utils.*, 12 *N.J.* 568, 596–97, 97 *A.*2d 602 (1953), the Court held that the BPU is required to allow a public utility to include some charitable contributions in its operating expenses:

[I]t has been held that where utility corporations have inherent or statutory power to make charitable gifts and donations, the payment is properly allowed in a rate determination as an operating expense where it has an effect upon the creation of the service or product of the corporation and therefore may be considered as reasonably necessary in the rendition of service to the consumer. This appears to be a salutary legal premise.

[Citations omitted.]

Subsequent to *New Jersey Bell Telephone*, the BPU adopted a policy of allowing public utilities to treat a portion of their charitable contributions as operating expenses. See *In re Public Serv. Elec. & Gas Co.*, 59 *P.U.R.* 4th 42 (1984). In *New Jersey Dep't of the Pub. Advocate v. New Jersey Bd. of Pub. Utils.*, 189 *N.J.Super.* 491, 515, 460 *A.*2d 1057 (App.Div.1983), this court recognized that "[t]he [BPU] has consistently permitted reasonable, nondiscriminatory charitable donations to qualify as operating expenses in a utility rate case[,]" and rejected the Public Advocate's challenge to the BPU's allowance of a portion of a water company's charitable contributions as operating expenses.

In *In re Jersey Cent. Power & Light Co. Rate Application*, 94 *N.J.A.R.*2d (Vol.8) 49, 53 (Bd. of Regulatory Comm'rs), the BPU concluded that the expense of charitable contributions should be shared between ratepayers and shareholders on a $50/50$ basis:

> The Board recognizes that Company contributions to charitable organizations result in direct and indirect benefits to the Company's employees, customers and communities because donations are made to community service agencies which are used by JCP & L ratepayers. Donations are also made to universities and colleges located within or near the Company's service area.
>
> However, the Board also recognizes that ratepayers have no say as to whether to contribute, how much to contribute or to what agencies contributions should be made....
>
> The Board will continue to review this issue in future cases. In the meantime, the Board is convinced that a $50/50$ sharing between ratepayers and shareholders is a more appropriate allocation than the prior 75/25 policy.

In the present case, the BPU decided to adhere to its policy of allowing public utilities to treat fifty percent of their charitable contributions as operating expenses, but left open the possibility of changing that policy in future rate cases:

> This Board continues to believe that charitable contributions by a public utility benefit ratepayers sufficiently to warrant some degree of rate recognition as an expense related to a utility's business operations. Indeed, a $50/50$ sharing recognizes that a utility's customer benefit, either directly or indirectly, by virtue of contributions made to community funds, educational campaigns, and the like. Charitable contributions also enhance a utility's standing and good will in a community and therefore benefit shareholders. A $50/50$ sharing policy properly balances ratepayer and stockholder interests.

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

> In the present case, the Advocate has not demonstrated abuse on the part of the Company with respect to the amount of its charitable contribution expenses.... While this Board has determined that a 5‰ sharing of the Company's charitable contributions expense is reasonable, it remains committed, as stated in *JCP & L Rates,* to the continuing review of Board policy in this area. Towards that end, Staff is to monitor the rate treatment accorded utility charitable contribution expenses in other jurisdictions and advise the Board accordingly.

■ We perceive no abuse of discretion in the BPU's decision, consistent with prior agency policy, to allow American Water to include fifty percent of its charitable contributions in its operating expenses in calculating the rates charged consumers for water and sewer services. The allocation of fifty percent of those contributions to operating expenses has no appreciable impact on the rates American Water charges consumers. Moreover, the Ratepayer Advocate acknowledges that recipients of American Water's contributions are "important contributors to the overall well being of the many communities served by the utility."

Although a majority of other states do not allow public utilities to treat charitable contributions as operating expenses, a minority do allow public utilities to include at least a portion of their charitable contributions in operating expenses. *See, e.g., In re Diamond State Tel. Co.,* 149 *A.*2d 324, 331 (Del.1959); *Providence Gas Co. v. Burman,* 119 *R.I.* 78, 376 *A.*2d 687, 698–99 (1977); *see also Denver Union Stock Yard Co. v. United States,* 304 *U.S.* 470, 482–83, 52 *S.Ct.* 990, 997–98, 82 *L.Ed.* 1469, 1479–80 (1938). Furthermore, the states that prohibit public utilities from claiming charitable contributions as operating expenses generally consider the issue to be within the discretionary authority of the state's public utility commission. *See, e.g., Southern Bell Tel. & Tel. Co. v. Florida Pub. Serv. Comm'n,* 443 *So.*2d 92, 96 (Fla.1983) ("The Commission has the authority to determine, as a policy issue, whether charitable contributions are to be included in operating expenses."); *South Cent. Bell Tel. Co. v. Public Serv. Comm'n,* 702 *S.W.*2d 447, 452 (Ky.Ct.App.1985). Thus, the case law from other states relied upon by the Ratepayer Advocate simply shows that other state public utility commissions have made a different policy choice than the BPU concerning this issue.

The Ratepayer Advocate does not argue that American Water's total charitable contributions are excessive or that any particular contributions are inappropriate or unreasonable. Instead, it contends that "[t]he nature of the recipients or the amount of the donations is ... immaterial[,]" and that "all charitable contributions [should be] charged to the shareholders of the [utility]." We reject this argument and conclude, essentially for the reasons set forth in the BPU's decision, that there is a reasonable basis for allowing a public utility to include a portion of its charitable contributions as operating expenses.

## II

The Ratepayer Advocate also argues that the BPU violated the First Amendment to the United States Constitution and Article I, paragraph 6 of the New Jersey Constitution by allowing American Water to treat a portion of its charitable contributions as operating expenses. The Ratepayer Advocate's theory is that the additional eight cents per year the average residential customer must pay for water service as a result of the allowance of this expense constitutes a "coerced" contribution to "charitable organizations whose principles and activities some ratepayers may find objectionable," and thus violates rights of "free speech" and "expressive association."

Before considering this argument, we note that the BPU questions whether the approval of American Water's rate application, which allowed a portion of the utility's charitable contributions to be included in operating expenses, constituted "state action" subject to the restrictions of First Amendment. *See Jackson v. Metropolitan Edison Co.*, 419 *U.S.* 345, 350, 95 *S.Ct.* 449, 453, 42 *L.Ed.*2d 477, 483–84 (1974) (indicating that the "mere fact" that a public utility is subject to "extensive and detailed" regulation "does not by itself convert its action into that of the State"); *see also American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 *U.S.* 40, 52, 119 *S.Ct.* 977, 986, 143 *L.Ed.*2d 130, 145 (1999) ("Action taken by private entities with mere approval or acquiescence of the State is

not state action."). However, the Ratepayer Advocate's claim is predicated not only on the First Amendment but also the New Jersey Constitution, which grants "free speech rights ... that unlike the First Amendment, ... [are] not limited to protection from government interference." *New Jersey Coalition Against War in the Middle East v. J.M.B. Realty Corp.*, 138 *N.J.* 326, 353, 650 *A.*2d 757 (1994), *cert. denied,* 516 *U.S.* 812, 116 *S.Ct.* 62, 133 *L.Ed.*2d 25 (1995); *see also State v. Schmid,* 84 *N.J.* 535, 560, 423 *A.*2d 615 (1980), *appeal dismissed sub nom., Princeton University v. Schmid,* 455 *U.S.* 100, 102 *S.Ct.* 867, 70 *L.Ed.*2d 855 (1982). Moreover, the BPU's discussion of this point is limited to a brief footnote, which only asserts that there is "some doubt" whether the BPU's role in approving American Water's rate application provides the "requisite state action" to support a First Amendment claim. Therefore, we assume, without deciding, that a sufficient showing of "state action" has been made, and proceed to the merits of the Ratepayer Advocate's claim that the inclusion of a portion of a public utility's charitable contributions in its operating expenses violates ratepayers' free speech rights.

Although the Ratepayer Advocate's argument rests on both the First Amendment and the New Jersey Constitution, with the exception of the "state action" requirement, our courts "rely on federal constitutional principles in interpreting the free speech clause of the New Jersey Constitution." *Karins v. City of Atlantic City,* 152 *N.J.* 532, 547, 706 *A.*2d 706 (1998); *see also Shelton College v. State Bd. of Educ.,* 48 *N.J.* 501, 518, 226 *A.*2d 612 (1967). Thus, the analysis of the Ratepayer Advocate's claim under the First Amendment also encompasses its claim under the free speech guarantee of the New Jersey Constitution.

The Ratepayer Advocate's argument relies primarily upon a series of decisions by the Supreme Court of the United States, *Abood v. Detroit Bd. of Educ.,* 431 *U.S.* 209, 97 *S.Ct.* 1782, 52 *L.Ed.*2d 261 (1977); *Ellis v. Railway Clerks,* 466 *U.S.* 435, 104 *S.Ct.* 1883, 80 *L.Ed.*2d 428 (1984) and *Chicago Teachers Union v. Hudson,* 475 *U.S.* 292, 106 *S.Ct.* 1066, 89 *L.Ed.*2d 232 (1986), which

hold that a nonmember of a union required to pay dues under the "union shop" provisions of federal and state labor laws may not be compelled to contribute to the union's political and ideological activities. In *Abood,* the Court recognized that "a union [may] constitutionally spend funds for the expression of political views, on behalf of political candidates, or towards the advancement of other ideological causes not germane to its duties as collective bargaining representative." 431 *U.S.* at 235, 97 *S.Ct.* at 1800, 52 *L.Ed.*2d at 284–85. However, the Court held that "the Constitution requires . . . that such expenditures be financed from charges, dues, or assessments paid by employees who do not object to advancing those ideas and who are not coerced into doing so against their will." *Id.* at 235–36, 97 *S.Ct.* at 1800, 52 *L.Ed.*2d at 285. Despite holding that nonmembers of a union may not be compelled to contribute to expressive activities with which they disagree, the Court denied plaintiffs' application for a blanket injunction preventing the union from collecting dues used for political or ideological activities from any nonmember, thereby imposing the responsibility on each individual nonmember to communicate his or her objections to the union. *Id.* at 237–42, 97 *S.Ct.* at 1800–03, 52 *L.Ed.*2d at 285–89.

In *Keller v. State Bar of Cal.,* 496 *U.S.* 1, 110 *S.Ct.* 2228, 110 *L. Ed.*2d 1 (1990), the Court held that an attorney who is compelled to join an integrated state bar association in order to engage in the practice of law occupies a position similar to a worker compelled to pay union dues under a union shop provision and must be afforded the same right not to contribute to political and ideological activities with which the attorney disagrees.

However, the Supreme Court has recently indicated that:

> *Abood,* and the cases that follow it, did not announce a broad First Amendment right not to be compelled to provide financial support for any organization that conducts expressive activities. Rather, *Abood* merely recognized a First Amendment interest in not being compelled to contribute to an organization whose expressive activities conflict with one's "freedom of belief."

[*Glickman v. Wileman Bros.*, 521 *U.S.* 457, 471, 117 *S.Ct.* 2130, 2139, 138 *L.Ed.*2d 585, 601 (1997) (quoting *Abood, supra,* 431 *U.S.* at 235, 97 *S.Ct.* at 1799, 52 *L.Ed.*2d at 284).]

Accordingly, the Court rejected a constitutional attack on regulations that required all growers of tree fruits to contribute to the generic advertising of those products, even though such advertising constitutes "commercial speech." *Id.* at 469–77, 117 *S.Ct.* at 2138–42, 138 *L.Ed.*2d at 599–604. The Court observed that compelling contributions for such a purpose "cannot be said to engender any crisis of conscience" or to involve "any political or ideological disagreement with the content of the message." *Id.* at 472, 117 *S.Ct.* at 2139–40, 138 *L.Ed.*2d at 601–02.

In *Board of Regents of Univ. of Wisc. Sys. v. Southworth,* —— *U.S.* ——, 120 *S.Ct.* 1346, 146 *L.Ed.*2d 193 (2000), the Court declined to extend the reasoning of *Abood* and *Keller* to mandatory student fees that fund ideological student activities at a public university. The Court observed that the standard applied in *Abood* and *Keller,* under which dissenting union and bar association members may be required to contribute only "to speech germane to the purposes of the union or bar association[,]" is "difficult to define ... with ease or precision," and "becomes all the more unmanageable in the public university setting ... where the State undertakes to stimulate the whole universe of speech and ideas." *Id.* at ——, 120 *S.Ct.* at 1355, 146 *L.Ed.*2d at 207. Accordingly, the Court held that "[t]he First Amendment permits a public university to charge its students an activity fee used to fund extracurricular student speech if the program is viewpoint neutral." *Id.* at ——, 120 *S.Ct.* at 1350, 146 *L.Ed.*2d at 200–01.

In a concurring opinion, Justice Souter noted that a student who is compelled to contribute to a student activity fee that is distributed to numerous organizations engaged in a variety of expressive activities has a more attenuated relationship to expressive activity with which the student disagrees than a person who is compelled to pay dues that a union or bar association directly uses to promote its political or ideological agenda:

In the union and bar association cases, an individual was required to join or at least drop money in the coffers of the very organization promoting messages subject to objection. The connection between the forced contributor and the ultimate message was as direct as the unmediated contribution to the organization doing the speaking. The student contributor, however, has to fund only a distributing agency having itself no social, political, or ideological character and itself engaging (as all parties agree) in no expression of any distinct message.... Thus, the clear connection between fee payer and offensive speech that loomed large in our decisions in the union and bar cases is simply not evident here.

[*Id.* at ——, 120 *S.Ct.* at 1360, 146 *L.Ed.*2d at 212 (citations omitted).]

Two significant limiting principles emerge from the Supreme Court's opinions dealing with compelled contributions for expressive activities. First, the First Amendment only precludes compelled contributions to an organization which engages in expressive activities that are "political or ideological" in nature. *Glickman, supra,* 521 *U.S.* at 473, 117 *S.Ct.* at 2140, 138 *L.Ed.*2d at 602. Second, the First Amendment restrictions on compelled contributions apply only to individuals who have personal objections to an organization's expressive activities. *See Abood, supra,* 431 *U.S.* at 237–42, 97 *S.Ct.* at 1800–03, 52 *L.Ed.*2d at 285–89.

The Ratepayer Advocate's broad claim that the BPU violates the First Amendment by allowing a public utility to include a portion of its charitable contributions in operating expenses cannot be reconciled within these principles. The Ratepayer Advocate candidly acknowledges that most of American Water's charitable contributions are made to "nonsectarian, apolitical institutions." The recipients of those contributions include educational institutions, medical research programs, hospitals, volunteer fire companies, first aid squads and the United Way. Although these charities undoubtedly engage in some expressive activities, such as fundraising, there is no indication those activities are political or ideological in nature. Consequently, as in *Glickman,* there is no danger that compelled contributions to such charities will "engender any crisis of conscience." 521 *U.S.* at 472, 117 *S.Ct.* at 2139, 138 *L.Ed.*2d at 601.

In its reply brief, the Ratepayer Advocate argues for the first time that some recipients of American Water's charitable contribu-

tions are "organizations which some customers could find offensive to their personal beliefs." The Ratepayer Advocate identifies Morristown Memorial Hospital as an example of such a recipient, because it allegedly allows abortions to be performed in its facilities. However, there is no indication American Water's contributions to Morristown Memorial Hospital are used to fund abortions. The Ratepayer Advocate also notes that American Water made three fifty dollar contributions to churches. However, the record does not indicate whether those contributions were made to the churches' general funds or for nonsectarian activities such as providing Thanksgiving dinners for the needy. Consequently, the relationship between American Water's contributions to these charities and the ideological views of any of its ratepayers is highly speculative. Moreover, the relationship between the inclusion in ratepayers' bills of the minuscule additional amounts represented by these contributions and any ideological objections ratepayers may have to some recipients is even more attenuated than the relationship between student activity fees and the expressive activities of some ultimate recipients of those fees discussed in Justice Souter's concurrence in *Southworth.*

In any event, if the Ratepayer Advocate had legitimate objections to some of the specific charitable contributions American Water claimed as operating expenses, it should have raised those objections before the BPU, thereby affording American Water an opportunity to respond. But insofar as the record before us indicates, the Ratepayer Advocate's reply brief represents the first time it has objected to any of American Water's individual charitable contributions. Therefore, those objections are untimely and must be deemed to have been waived. *See Abbott v. Burke,* 119 *N.J.* 287, 390, 575 *A.*2d 359 (1990).

The Ratepayer Advocate's First Amendment claim also must be rejected because it fails to identify any individual ratepayer whose free speech rights have been violated. The Ratepayer Advocate is a state agency which represents the financial interests of customers in matters relating to utility rates and policy. See Reorgani-

zation Plan No. 001–1994, set forth in *N.J.S.A.* 13:1D–1. The Ratepayer Advocate does not allege that it is one of American Water's customers, nor does the Ratepayer Advocate seek to advance its own First Amendment claim. Instead, the Ratepayer Advocate asserts that the BPU's policy of allowing public utilities to treat a portion of their charitable contributions as operating expenses violates the First Amendment rights of hypothetical ratepayers who the Ratepayer Advocate presumes would object to the activities of some recipients of American Water's charitable contributions. Thus, the Ratepayer Advocate's First Amendment claim is a legal abstraction, without any connection to the personal beliefs of any identifiable American Water customer.

■ The Supreme Court's decisions dealing with compelled contributions for expressive activities do not support such a claim. The First Amendment right recognized in those decisions is purely an individual right. An individual who is required to pay dues to a union or bar association may not be compelled to contribute to non-germane political or ideological activities with which that individual disagrees. *See Abood, supra,* 431 *U.S.* at 235–36, 97 *S.Ct.* at 1800, 52 *L.Ed.*2d at 285. However, such an individual may not prevent the organization from engaging in political and ideological activities with funds obtained from other persons who do not object to those activities. *See id.* at 235–36, 97 *S.Ct.* at 1800, 52 *L.Ed.*2d at 284–85; *see also Broadrick v. Oklahoma,* 413 *U.S.* 601, 610, 93 *S.Ct.* 2908, 2915, 37 *L.Ed.*2d 830, 839 (1973) ("[C]onstitutional rights are personal and may not be asserted vicariously"). Therefore, the Ratepayer Advocate may not rely upon presumed ideological objections to American Water's charitable contributions by unidentified, hypothetical ratepayers to prevent American Water from treating its charitable contributions as operating expenses.

The Ratepayer Advocate relies upon *Cahill v. Public Serv. Comm'n,* 76 *N.Y.*2d 102, 556 *N.Y.S.*2d 840, 556 *N.E.*2d 133, *cert. denied,* 498 *U.S.* 939, 111 *S.Ct.* 344, 112 *L.Ed.*2d 309 (1990), which upheld a First Amendment challenge to the inclusion of charitable

contributions in a utility's operating expenses. However, *Cahill* was decided prior to *Glickman* and *Southworth,* which limit the scope of First Amendment restrictions upon compelled contributions for expressive activities. Furthermore, one of the parties advancing the First Amendment claim in *Cahill* was an actual ratepayer who alleged that the defendant utility had contributed to organizations which engaged in activities that conflicted with his personal beliefs, rather than a public agency raising hypothetical First Amendment objections to any ratepayer being required to bear responsibility for the payment of any portion of a utility's charitable contributions.

Finally, we emphasize that the BPU has not given public utilities carte blanche authority to include a portion of any and all charitable contributions in their operating expenses. A public utility is prohibited by statute from making contributions to candidates for public office and from "aid[ing] or promot[ing] the interests, success or defeat of any political party." *N.J.S.A.* 19:34–45. We assume that the BPU also would prohibit a public utility from making contributions to charities with ideological missions that are likely to be offensive to a significant segment of the utility's ratepayers. Moreover, the Ratepayer Advocate could object to specific charitable contributions on this basis. However, the mere specter that the management of some utility could make contributions to inappropriate charitable recipients should not foreclose the BPU from allowing utilities to treat a portion of their contributions to non-ideological charitable organizations that perform vital public services as operating expenses.

Affirmed.