**CAREY, Rec., v. CORPORATION COMMISSION.**

No. 24930.   May 29, 1934.

Rehearing Denied June 26, 1934.

C. C. Mount, Dudley, Hyde, Duvall & Dudley, and Rainey, Flynn, Green & Anderson, for plaintiff in error.

Holmes Baldridge, for defendant in error.

BAYLESS, J. Logan W. Carey, receiver of the properties of the Consolidated Gas Company, hereinafter referred to as company, appeals from an order of the Corporation Commission of Oklahoma, in causes Nos. 10956 and 10970, consolidated for trial and appeal, reducing the gate rate charge for natural gas to the towns of Mangum and Granite. Each of these towns operates its own gas distributing system, and buys its gas from the company at its city limits. This gas is purchased under a written contract (separate for each town), specifying the charges, and has several years to run. Each town petitioned for a reduction in gate rate charges despite the contracts. These petitions were heard, and, upon complete hearing, the rates were found to be excessive, and ordered reduced accordingly.

The first proposition argued by the company is the want of jurisdiction of the Commission over these parties for the purpose of regulating directly or indirectly the rates or charges affecting a municipally owned and operated public utility. It is asserted that the Corporation Commission is not given authority to regulate the affairs of a municipally owned and operated public utility, in so far as its rates, services, etc., are concerned within its city limits, and, therefore, it is no concern of the Corporation Commission what it pays for its gas supply. It is further argued, admitting for the sake of argument, the Commission had such power, that each situation must show the existence of a status affected with a public interest to justify the interposition of the paramount authority of the Corporation Commission as regards the contracts by which a municipality purchases a commodity to be dispensed by its utility plant; and, because the Corporation Commission cannot follow reduction in gate rate cost to a municipally owned and operated public utility to its necessary ultimate destination, the consumer at the burner tip, no public interest is involved.

We have carefully considered this record and do not find in it any evidence of an attempt on the part of the Corporation Commission to exercise control, within the town limits, of rates, charges, services, etc., of the municipally owned and operated plants. We are therefore not called upon herein to determine whether the Corporation Commission can exercise supervision, regulation, and control over the rates, charges, services, etc., of a municipally owned and operated public utility as regards its patrons.

But, the towns, as owners and operators of these plants, are purchasers of gas, and if they purchase it from a public service company within the definition of our Constitution, art. 9, sec. 34, and chapter 93, S. L. 1913, they are entitled to the same protection and relief against overcharge and partiality on the part of the public service company as any other purchaser, be the purchaser an individual, a private corporation, public service company, or a municipality. It is because the company is a public service company, within the definition of the Constitution and laws, supra, if it is; and the towns are its patrons, then the Corporation Commission's authority arises.

Is the company a public service company? We do not find this fact denied at any place in the record, but on the contrary the entire record and the purport of company's argument are indicative of the fact that the company is a public service company, as above defined, and is subject to the authority of the Corporation Commission. The record shows that the company produces, buys, transports, and sells natural gas, all within Oklahoma, by this particular line. We, therefore, hold that the Commission had jurisdiction of this matter to regulate the gate rate charges of the company to these towns, in the interest of the public. Any contracts it has made regarding its services and rates must fall before the Commission's proper orders. American Indian Oil & Gas Co. v. Collins & Co., 157 Okla. 49, 9 P. (2d) 438; and City of Durant v. Consumers, etc., Co., 71 Okla. 282, 177 P. 361.

The next proposition discussed and presented by the company concerns the rate base, which is asserted to be erroneous. The record presented to us on appeal is in some

respects inadequate. We have held, and it is the general rule, that no artificial formula is exclusive or even preferable, but that the Commission should take into consideration a number of elements, such as reproduction cost new less depreciation, historical value, book value, present day purchase power of the dollar, commodity price index, the financial history of the company, and any and all other pertinent or relevant facts tending to throw light upon the subject under consideration: a rate base which will result in an adequate return. We believe that the language of the Supreme Court of the United States, in the case of Los Angeles G. & E. Corp. v. Railroad Commission, 289 U. S. 287, 77 L. Ed. 1180, best states the purpose which should actuate rate-making bodies in arriving at present fair value when it said:

"The determination of present value is not an end in itself. Its purpose is to afford ground for prediction as to the future. It is to make possible an 'intelligent forecast of probable future values' in order that the validity of rates for the future may be determined. 'Estimates for tomorrow,' the court has said, 'cannot ignore prices of today.'"

An examination of this record shows that the entire matter has been conducted and determined upon the reproduction cost new less depreciation formula. We do not hold this to be error in this case because of the fact that both the company and the Commission have used and each urges the correctness of its figures based upon this formula. Many of the elements above named, and especially the book cost of the plant, or, in its absence, the historical cost, and the financial history of the company, would be of great assistance in arriving at the determination of this question.

Without going into an extended discussion of the constitutional questions involved, it is sufficient to say here that the plea of confiscation arises under the federal Constitution, and is designed to present a federal question for the protection of the company. This is its complete and absolute right to do so, and this opinion is not to be construed as an attempt to deny to it this right. However, with this view in mind, we feel that these contentions are best answered by the statements of the federal courts. The Supreme Court of the United States, in the case of Lindheimer v. Illinois Bell Telephone Co., 54 S. Ct. 658, 78 L. Ed. —, said that confiscation being the issue, the utility had the burden of proof.

In arriving at the reproduction cost new, the only evidence available was the expert evidence of the company's engineers, which was purely estimates. One of the engineers is the valuation expert for the Commission. The engineers on behalf of the company were its regular employees. Whatever may be said of the experience of these respective witnesses, this court cannot overlook the fact that each, consciously or unconsciously, was influenced or biased by the result sought by the party in whose behalf he was testifying. These witnesses seem to have made their inspections and appraisals at or near the same time, and there is no controversy between them as to the quantity of materials or the inventory of the property inspected and appraised. The difference in their testimony arises from their judgment of the costs of the property going into the plant. The Commission adopted, to a large extent, if not wholly, the evidence of its engineer as to the reproduction cost new. It was, in fact, the trying and finding body; where it was presented with evidence of experts of fairly wide divergence in range, we cannot say that it was in error by adopting one and refusing to adopt the other. By the terms of article 9, sec. 22, Constitution of Oklahoma, the action of the Commission appealed from shall be regarded prima facie just, reasonable, and correct. This places the burden of rebutting this prima facie presumption upon the company, and we conclude that it has not met that burden in this instance.

In taking up the question of the present fair value of the company, we must notice the difference in the evidence concerning the condition per cent. of the company. The Commission's engineer found that the company's condition per cent. was 80.56; the company's engineers found that the condition per cent. was 92.04; and the Commission in its findings adopted the figure of 85. This was not an approval of the figures of either engineer, but it was rather what might be termed a figure falling within the discretion of the Commission, taking into consideration all of the evidence before it. The engineer for the Commission testified that he arrived at his figure by what is called the straight line method of accrued depreciation modified by the method of observation or inspection. The company's

engineer testified that his figure was arrived at by observation only. However, it seems to us that the difference between these figures and theories is greater as a matter of theory or practice than is indicated by the witness's statements. When a plant, such as the one we have under consideration, is constructed of new materials, as this one was, it is reasonable to believe that its value at the inception of its service life is 100 per cent. It is also reasonable, and borne out by experience, that immediately upon inception of its use, wear, tear, and obsolescence set in. This is depreciation. Lindheimer v. Illinois Bell Telephone Co., supra. It is proper to allow as a part of the operating expenses of a company an annual maintenance fund through which defective, destroyed, inadequate or obsolete parts may be repaired or replaced. Such repairs and replacements constitute a resistance against not only the depreciation in value of the plant from the standpoint of value, but also against any loss in functional efficiency. It may result in such a successful resistance of functional efficiency as that the plant, whatever its life in years is, may be practically 100 per cent. functionally efficient; but experience, accounting practice, and engineering science have learned, and it is generally believed and accepted, that the resistance, by annual maintenance allowances, against depreciation in value is not so successful, and that regardless of repairs and replacements, as time goes on the value of the plant decreases. For this reason, in addition to the annual maintenance allowances as an operating expense, there has grown up and is well recognized an annual allowance for depreciation. There are a number of methods of determining depreciation, either for given periods of time or for the entire life of the plant. The method used by the company's engineer is one that is generally recognized, but the result arrived at by the company engineer is, in its last analysis, functional efficiency rather than accrued depreciation. The Interstate Commerce Commission. which has probably given more study to the subject of depreciation than any other ratemaking body in the United States, has found that the straight-line method of determining depreciation is preferable and comes nearer giving true theoretical results than any other method. This method was commented upon and approved by the United States Supreme Court in the case of Lindheimer et al. v. Illinois Bell Telephone Co., supra. Since the method used by the Commission's witness was the straight-line method as modified by observation, and the method used by the company's witness was observation only, and the figure adopted by the Commission was between these two figures, we feel that the Commission's applied figure of condition per cent. was proper. To make an annual allowance for depreciation of any amount whatever, and at the same time to find that, by reason of repairs and replacements charged to the annual operating expenses, the plant was kept in a high state of efficiency and thereby its value has been kept proportionately high, is to adopt inconsistent positions. The annual allowance for depreciation can only be allowed upon the ground that such depreciation has been found to occur as a matter of experience, and has been presumed to occur regardless of functional efficiency of plant capacity as maintained by repairs or replacements.

There are discrepancies between estimated cost of rights of way and labor; a denial of any allowance for taxes during construction, contractor's profit or going-concern value; and an allowance for interest during the construction, organization, and legal expense, materials, and supplies, and working capital of less size than the company desired. There is a discrepancy between the estimated condition per cent. of the company on the part of the Commission's engineer and the company's engineers of 12 per cent. Indeed, there appears to be a discrepancy between these witnesses as to the proper method of arriving at condition per cent. or what condition per cent. is.

As to the difference in the cost of right of way and labor, each witness bases his estimate upon evidence obtained in the community and elsewhere which was satisfactory to him, and the Commission has adopted its engineers' figures and these are prima facie correct.

As to the items of tax during construction and contractors' profit, the Commission rejected these because there was no showing that such expenses had been incurred or was likely to be incurred. The estimates of both engineers as to the length of time which it would take to construct this unit places the time at less than one year, and the Commission finds that in such instances taxes are practically never paid. Taxes are assessed at a given period very early in the calendar year and usually no effort is made to assess taxes until the corresponding period in the succeeding year, and for this reason the Commission's finding there-

of is proper. As to the contractors' profit there is no history to show that one was paid, and in our judgment it is never proper to allow a contractor's profit as a part of the reproduction cost new of a plant where costs are figured, as they were in this case, upon current quoted retail prices. Contractor's prices, which include his profit, usually come by bid, which is competitive, and contractors are usually able to purchase materials and equipment at the price quoted to the ordinary retail trade, and for these reasons the Commission was justified in refusing to allow the contractor's profit. The company contends that it is entitled to an allowance of 10 per cent. of the reproduction cost new less depreciation in value of the plant for going-concern value. It cites authorities by which it hopes to establish that going-concern value is a necessary element in this formula. This is not true whatever the cases formerly may have held. It is generally recognized now that the reproduction cost new less depreciation, or book value, less depreciation, or historical cost, less depreciation, plus interest during construction, plus organization and legal expense, plus an allowance for materials, supplies, working capital and taxes, make a hypothetical company having an existence, and being more than a mere bare bones organization, and that in the estimates and allowance so made, what is generally termed as "going-concern value" is adequately covered. Pioneer Telephone & Teleg. Co. v. State, 64 Okla. 304, 167 P. 995; Mullendore Gas Co. v. Stillwater, 120 Okla. 140, 250 P. 895; and Los Angeles G. & E. Corp. v. Railroad Commission, 289 U. S. 287, 77 L. Ed. 1180.

The discrepancies between the amounts desired by the company for interest during construction, organization and legal expenses, materials and supplies, working capital and federal income tax falls within what we have heretofore said concerning the witnesses, their interest in the case, the burden which rests upon the company and the prima facie presumption of correctness which we must accord to the Commission's order.

The third proposition concerns the allowance of 7 per cent. per annum as a fair return for the company. The company asserts this is confiscatory. The Supreme Court of the United States said in Dayton Power & Light Co. v. Public Utilities Commission of Ohio, 54 S. Ct. 647, 78 L. Ed. —, that the allowance of a rate of return of 6½ per cent. for a natural gas utility was

adequate because it took judicial notice of business conditions at this time. We, therefore, approve the Commission's figure of 7 per cent. in this instance as being adequate.

The next proposition concerns the Commission's allowance of 4 per cent. annually for depreciation and amortization upon depreciable property. The company urges that it should be allowed at least 8 per cent. This contention is based upon the testimony of its engineer who says that this allowance is necessary, but who also says in the next breath that the company has depreciated in six years' time less than 8 per cent. Of course we have heretofore commented upon and disapproved his figures in respect to accrued depreciation, and we cannot accord them weight at this time in so far as the annual allowance for depreciation is concerned. Why it should now be necessary to make an allowance per annum in excess of six years' accumulated actual experience is not reasonably explained. Upon an allowance of 4 per cent. per annum, judging upon a straight-line method, it could be judged that the plant had at the time of its construction an estimated life of 25 years. This being so, and it having been in operation for six years, a similar allowance would have permitted the company to accrue a reserve for depreciation of 24 per cent. This would be in excess of the condition per cent. of the company as found by either engineer and as actually allowed by the Commission. In our judgment there is a reasonable and logical relationship between these two, therefore, in our judgment the allowance of the Commission of 4 per cent. per annum for depreciation is ample.

Proposition No. 5 concerns the action of the Commission in eliminating certain items of expenses in estimating future requirements. The first relates to the expenses of this rate hearing. The company asks for an allowance of $11,040, allocating $5,040 to salaries of regular employees of the company and $6,000 to attorneys' fees. The record shows that it used no engineer or employees outside of its regular staff; that it incurred no expense by their use outside of regular daily operating expenses, and for this reason the Commission denied such allowance. The evidence shows that it has an attorney regularly employed at an annual salary of $6,000 per year. For this reason the Commission refused to allow any additional expenses in this connection. In our judgment the Commission's action was correct and that it would only be proper to

allow for rate case expense when the public service company has reasonably and fairly employed necessary outside help in connection with such a case. It is probable that as a matter of accounting practices, the company may desire to allocate this expense to this particular part of the system, but this does not by any means set up a test of whether or not it should be allowed and amortized as a required future earning. Attorneys other than the company's regular attorney appear in this record, but it appears from the records that these attorneys were employed by the receiver for the company, at the express direction of the federal court having jurisdiction of the receivership proceedings, and we must take notice that allowances to attorneys for a receiver for service rendered to the receiver are cared for as expenses out of the earnings of the company to the receivership, if there are any, or from the sale of capital assets of the company as the court having jurisdiction so desires. Such employment of attorneys and allowances of fees play no part in the ascertainment of the present fair value of the company or the adequacy of the rate of return of the company.

Next is the question of dues, donations, and philanthropies of the company. It is a matter for the discretion of corporate management in making donations and paying dues. In that respect a corporation does not occupy a status far different from an individual. An individual determines the propriety of joining organizations, and contributing to their support by paying dues, and all contribution to public charities, etc., according to his means. He does not make such contributions above his means with the hope that his employer will increase his compensation accordingly. A corporation likewise should not do so. Its ultimate purpose, from its own standpoint, is to earn and pay dividends. If, as a matter of judgment, it desires to take part of its earnings, just as would an individual, and contribute them to a worthy public cause, it may do so; but we do not feel that it should be allowed to increase its earnings to take care thereof.

There are two certain items of uncollectible accounts on the books of the company, and it desired to amortize them over a period of years and have an allowance accordingly. The Commission denies this contention. In our judgment no harm has been done to the company in this respect, for the items are insignificant in amount and are still carried on the books of the company

as assets, and perhaps it has some hope of collecting it; and finally the determination of an adequate return cannot be pursued to so petty a detail.

The Commission refused to make an allowance for state income taxes principally because no income taxes had been paid to the state. This is not a sufficient reason. It may be that the return of the company is not adequate, and therefore it has no income upon which it could pay taxes, but this of itself would not be reason for not increasing its return, for upon the increase of its rate of return to an adequate figure, the state might thereby receive an income tax. However, as we have heretofore said, the entire question is one of estimate, and, if upon examination of the result of the Commission's action as a whole, it can be said that it has an adequate return, and we have said that 7 per cent. per annum is an adequate return in this instance, no reason exists for interfering with the judgment of the Commission in small detailed instances. There is no way of knowing how much the company may have to pay the state, as the records show it has not heretofore paid such taxes; the rates of income tax varies from year to year and in all events are payable only upon the net income of the company as determined by law of taxation. These rate hearings to establish permanent rates are not designed to establish a rate to last for years, but the jurisdiction of the Commission is summary and may be invoked at any time; and at best it is always hoped that the estimates and allowances made herein will prove adequate; but, if they do not do so, the company is at liberty to apply to the Commission at any time in the future for an increase in rates and its expressions upon the rate herein established should be convincing. The order of the Commission is affirmed.

RILEY, C. J., CULLISON, V. C. J., and SWINDALL, ANDREWS, McNEILL, OSBORN, BUSBY, and WELCH, JJ., concur.