777 A.2d 46

IN THE MATTER OF PETITION OF NEW JERSEY AMERICAN WATER COMPANY, INC., FOR AN INCREASE IN RATES FOR WATER AND SEWER SERVICE AND OTHER TARIFF MODIFICATIONS.

Argued March 13, 2001—Decided July 25, 2001.

*Blossom A. Peretz*, Ratepayer Advocate, and *Andrew K. Dembia*, Deputy Ratepayer Advocate, argued the cause for appellant, Division of the Ratepayer Advocate (*Ms. Peretz*, attorney; *Mr.*

*Dembia, Robert J. Brabston* and *Diane Schulze,* Assistant Deputies Ratepayer Advocate, on the briefs).

*William D. Lavery, Jr.,* argued the cause for respondent New Jersey American Water Company, Inc. (*Cozen and O'Connor,* attorneys; *William D. Hogan,* on the brief).

*Carla Vivian Bello,* Senior Deputy Attorney General, argued the cause for respondent New Jersey Board of Public Utilities (*John J. Farmer, Jr.,* Attorney General of New Jersey, attorney; *Andrea M. Silkowitz,* Assistant Attorney General, of counsel).

The opinion of the Court was delivered by

VERNIERO, J.

This appeal involves a final decision of the Board of Public Utilities (BPU) in respect of a rate petition filed by the New Jersey American Water Company (American Water). Within the context of that petition, the Division of the Ratepayer Advocate (Ratepayer Advocate) challenges the policy of the BPU that permits a utility to include half of its charitable contributions as operating expenses for purposes of calculating its service rates. Under that policy, a utility's ratepayers subsidize fifty percent of the utility's charitable contributions, whereas its shareholders bear the cost of the other fifty percent.

In reviewing the rate petition, the BPU applied its $^{50}\!/\!_0$ sharing policy and allowed American Water to include half of its charitable contributions in its operating expenses. The Ratepayer Advocate objected on statutory and constitutional grounds. The Appellate Division affirmed the BPU's determination. We now reverse. We hold that the BPU's $^{50}\!/\!_0$ sharing policy is arbitrary, lacks a sufficient basis in the record, and thus constitutes unreasonable agency action. Accordingly, no portion of a utility's charitable contributions may be subsidized by the utility's captive ratepayers. In view of that holding, we do not address the constitutional questions raised by the Ratepayer Advocate.

## I.

We begin by summarizing briefly the respective roles of the parties and the pertinent facts. The BPU consists of three members appointed by the Governor with the advice and consent of the Senate, and is administratively located within the executive branch. *N.J.S.A.* 48:2–1. The BPU is responsible for supervising and regulating public utilities in the State. *N.J.S.A.* 48:2–13.

The Ratepayer Advocate is administratively located within the BPU and "represents the financial interests of customers in matters relating to utility rates and policy." *In re N.J.–Am. Water Co.*, 333 *N.J.Super.* 398, 410, 755 *A.*2d 1192 (App.Div.2000). *See generally* Executive Reorganization Plan No. 001–1994, *reprinted in N.J.S.A.* 13:1D–1 (outlining function of Ratepayer Advocate and comparing it to predecessor, Office of Rate Counsel). The Ratepayer Advocate is "empowered to represent, protect, and advance the interests of all consumers of utility services, including residential, small business, commercial, and industrial ratepayers, in an effort to protect and promote the economic interests of all New Jersey ratepayers." *Ibid.*

American Water is a water utility engaged in the production, treatment, and distribution of water and the collection of sewage within its designated service territory, which includes parts of fifteen counties. Subject to the jurisdiction of the BPU, American Water provides water service to about 346,000 customers, and also provides sewer service to about 18,600 customers. It also sells water for resale to municipalities, authorities, and public utilities.

In January 1998, American Water filed a petition with the BPU to increase its rates for water and sewer service. The matter was transferred to the Office of Administrative Law and assigned to an Administrative Law Judge (ALJ), who heard testimony from representatives of American Water, the Ratepayer Advocate, and several other interested parties. Among its objections, the Ratepayer Advocate argued "that American Water should not be allowed to treat any portion of its charitable contributions as

operating expenses." *In re N.J.–Am. Water Co., supra,* 333 *N.J.Super.* at 401, 755 *A.*2d 1192.

American Water's disputed charitable contributions amounted to $99,185. Under the BPU's $^{50}\!/_{50}$ sharing policy, $49,592 of that amount was included in American Water's operating expenses. For rate-making purposes, $49,592 constituted .025 percent of the utility's total revenue requirements. Inclusion of that figure in American Water's operating costs would require residential rate-payers to pay an additional eight to ten cents annually on their water utility bills. During the administrative proceeding, American Water contended that its charitable donations are an important element of its responsibility to the communities it serves. In response, the Ratepayer Advocate argued that all of the charitable contributions should be excluded from operating expenses and thus be borne exclusively by the company's shareholders.

In January 1999, the ALJ rendered a decision that provided in part that the inclusion of charitable contributions was "a policy decision that only the Board of Public Utilities can make." Although acknowledging the reasonableness of the Ratepayer Advocate's arguments, the ALJ concluded that "there remain legitimate public policy concerns which the Board has heretofore seen fit to address in articulating a sharing policy. For purposes of this case I find a $^{50}\!/_{50}$ sharing to be reasonable, but commend to the Board this issue as one deserving of further consideration on a generic basis[.]"

In March 1999, the BPU adopted in part, modified in part, and rejected in part the ALJ's decision. The BPU adopted that part of the ALJ's decision pertaining to the $^{50}\!/_{50}$ sharing policy. (Because this appeal focuses solely on the contributions policy, we do not summarize or discuss the portions of the ALJ's and BPU's rulings unrelated to that issue.) The BPU memorialized its action in an order dated April 6, 1999. In that order the BPU states that it "continues to believe that charitable contributions by a public utility benefit ratepayers sufficiently to warrant some degree of rate recognition as an expense related to a utility's business

operations." In support of its $^{50}\!/\!_{50}$ sharing policy, the BPU explains that the policy "recognizes that a utility's customer benefit[s], either directly or indirectly, by virtue of contributions made to the community funds, educational campaigns, and the like." Moreover, the BPU notes that "[c]haritable contributions also enhance a utility's standing and good will in a community and therefore benefit shareholders. A $^{50}\!/\!_{50}$ sharing policy properly balances ratepayer and stockholder interests."

Before the Appellate Division, the Ratepayer Advocate challenged the BPU's decision, arguing (1) that the BPU's ruling was erroneous because charitable contributions are not germane to a public utility, and (2) that the ruling violated the First Amendment of the United States Constitution and Article I, paragraph 6 of the New Jersey Constitution because it compelled ratepayers indirectly to subsidize charitable activities. *In re N.J.–Am. Water Co.,* *supra,* 333 *N.J.Super.* at 402, 755 *A.*2d 1192. The Appellate Division affirmed the BPU's action. We granted the Ratepayer Advocate's petition for certification. 165 *N.J.* 601, 762 *A.*2d 216 (2000).

## II.

Title 48 sets forth the powers and duties of the BPU. The statute provides that the BPU has "general supervision and regulation of and jurisdiction and control over all public utilities as defined in this section and their property, property rights, equipment, facilities and franchises so far as may be necessary for the purpose of carrying out the provisions of this Title." *N.J.S.A.* 48:2–13a. Specifically, the agency is authorized to require that public utilities "furnish safe, adequate and proper service[.]" *N.J.S.A.* 48:2–23.

Pertinent to this appeal, the Legislature has entrusted the BPU with ensuring just and reasonable utility rates. *N.J.S.A.* 48:2–21. In that regard, *N.J.S.A.* 48:2–21(d) provides:

When any public utility shall increase any existing individual rates, joint rates, tolls, charges or schedules thereof, as well as commutation, mileage and other

special rates, or change or alter any existing classification, *the board, either upon written complaint or upon its own initiative, shall have power after hearing, upon notice, by order in writing to determine whether the increase, change or alteration is just and reasonable. The burden of proof to show that the increase, change or alteration is just and reasonable shall be upon the public utility making the same.* The board, pending such hearing and determination, may order the suspension of the increase, change or alteration until the board shall have approved the same, not exceeding 4 months. If the hearing and determination shall not have been concluded within such 4 months the board may during such hearing and determination order a further suspension for an additional period not exceeding [ ] 4 months. *The board shall approve the increase, change or alteration upon being satisfied that the same is just and reasonable.*
[ (emphases added).]

 To demonstrate that a requested rate increase is just and reasonable, "the utility must prove: (1) the value of its property or the rate base, (2) the amount of its expenses, including operations, income taxes, and depreciation, and (3) a fair rate of return to investors." *In re Petition of Pub. Serv. Elec. & Gas,* 304 *N.J.Super.* 247, 265, 699 *A.*2d 1224 (App.Div.), *certif. denied,* 152 *N.J.* 12, 702 *A.*2d 351 (1997). In that context, this Court has stated that "rate making is a legislative and not a judicial function, and that the [BPU], to which the Legislature has delegated its rate-making power, is vested with broad discretion in the exercise of that authority." *In re Petition of Pub. Serv. Coordinated Transp.,* 5 *N.J.* 196, 214, 74 *A.*2d 580 (1950).

 Although the BPU's "rulings are entitled to presumptive validity[,]" *In re Petition of Jersey Central Power & Light Co.,* 85 *N.J.* 520, 527, 428 *A.*2d 498 (1981), they are not immune from judicial review. The Legislature has authorized courts expressly to "review any order of the board and to set aside such order in whole or in part when it clearly appears that there was no evidence before the board to support the same reasonably or that the same was without jurisdiction of the board." *N.J.S.A.* 48:2–46. In the same vein, a court will not sustain an action by the BPU, or that of any other administrative agency, when that action is found to be "arbitrary, capricious, unreasonable, or beyond the agency's delegated powers." *In re Amendment of N.J.A.C. 8:31B–3.31,* 119 *N.J.* 531, 544, 575 *A.*2d 481 (1990). *See generally In re Pub. Serv.*

*Elec. & Gas Co.'s Rate Unbundling, Stranded Costs & Restructuring Filings,* 167 *N.J.* 377, 384–85, 771 *A.*2d 1163 (2001) (outlining standard of review governing BPU orders).

New Jersey statutory law is silent on how to treat a regulated utility's charitable contributions. The seminal case in which this Court held that a utility's charitable contributions may be included as operating expenses in a rate petition is *New Jersey Bell Telephone Co. v. Board of Public Utility Commissioners,* 12 *N.J.* 568, 97 *A.*2d 602 (1953) (*Bell*). Prior to that case, the BPU's predecessor agency had "found that it was unreasonable to require the consumer to pay for [a utility's charitable contributions]." *Id.* at 595, 97 *A.*2d 602. The agency's position had been that " 'in the determination of fair and reasonable rates, contributions and donations to charitable organizations are not a proper charge to operating expense.' " *Id.* at 596, 97 *A.*2d 602 (citation omitted). In *Bell,* this Court rejected that position, directing the agency to permit a utility to include its charitable contributions "as an operating expense where it has an effect upon the creation of the service or product of the corporation and therefore may be considered as reasonably necessary in the rendition of service to the consumer." *Ibid.*

In the wake of *Bell,* "[t]he [BPU] has consistently permitted reasonable, nondiscriminatory charitable donations to qualify as operating expenses in a utility rate case." *N.J. Dep't of the Pub. Advocate v. N.J. Bd. of Pub. Utils.,* 189 *N.J.Super.* 491, 515, 460 *A.*2d 1057 (App.Div.1983). *See also In re N.J. Bell Tel. Co.,* 24 *P.U.R.*3d 181, 194 (Bd. of Pub. Util. Comm'rs 1958) ("We are required to follow the [S]upreme [C]ourt pronouncement on this matter in [*Bell.*]"). The BPU's $^{50}/_0$ sharing policy replaced an earlier rule under which ratepayers bore seventy-five percent of the cost of a utility's charitable contributions. In explaining the current policy in the context of a previous rate petition, the BPU itself acknowledged some of the policy's troublesome aspects:

The [BPU] recognizes that [a utility's] contributions to charitable organizations result in direct and indirect benefits to the [utility's] employees, customers and communities because donations are made to community service agencies which are

used by [the utility's] ratepayers. Donations are also made to universities and colleges located within or near the [utility's] service area.

However, the [BPU] also recognizes that ratepayers have no say as to whether to contribute, how much to contribute or to what agencies contributions should be made. Arguably, these contributions are not indispensable to providing service to customers. Moreover, forced ratepayer participation eliminates the personal tax deduction benefit that individual ratepayers could receive if ratepayers contributed directly to the charity.

The [BPU] will continue to review this issue in future cases. In the meantime, the [BPU] is convinced that a 50‰ sharing between ratepayers and shareholders is a more appropriate allocation than the prior 75/25 policy.

[*In re Jersey Cent. Power & Light Co. Rate Application*, 94 *N.J.A.R.*2d (Vol.8) 49, 53 (Bd. of Regulatory Comm'rs).]

The BPU has not presented written guidelines concerning its treatment of charitable contributions. In its brief, the BPU states that it relies on factors similar to those expressed in a two-page set of guidelines developed by its Rhode Island counterpart. Those guidelines indicate that contributions must be "modest in amount," "productive of good community relations," and made to tax-exempt, non-profit organizations. In its April 6, 1999, order, the BPU provides no analysis of American Water's specific contributions (for example, the agency does not determine whether the contributions satisfy the Rhode Island criteria), other than to note that the Ratepayer Advocate "has not demonstrated abuse on the part of the Company with respect to the amount of its charitable contributions."

## III.

The Ratepayer Advocate asserts that by failing to provide a fact-based analysis of its specific contributions, American Water has not demonstrated a sufficient nexus between the effect of those contributions and the utility's "rendition of service to the consumer." *Bell, supra,* 12 *N.J.* at 596, 97 *A.*2d 602. The Ratepayer Advocate also claims that the court below improperly relieved the utility of the burden of demonstrating that its charitable contributions were necessary to serve its customer base. Lastly, it submits that there is no evidence that reasonably supports the BPU's action and thus "the policy of allowing 50‰

sharing of charitable contributions must be reversed." In response, American Water argues that the BPU properly exercised its discretion in allocating a portion of the utility's charitable contributions to its operating expenses as permitted by *Bell.* The utility claims that the BPU's sharing policy is sound and that its application here was permissible.

Likewise, the BPU contends that its $50\%$ sharing policy embodies a sufficient nexus between a utility's charitable giving and providing of services. The BPU suggests that its treatment of a utility's contributions is reasonable because such contributions are instrumental in creating a stable economic and social environment in a utility's service area. That, in turn, enhances the utility's ability to furnish sufficient service to consumers at fair rates. As an example, the BPU claims that contributions to social and economic support services foster more consistent bill-paying patterns by customers, which reduces the utility's bad-debt expenses that otherwise would be reflected in rates.

■ We agree with the Ratepayer Advocate that the BPU's $50\%$ sharing policy is arbitrary and lacks a sufficient evidentiary basis in the record. Accordingly, no portion of American Water's charitable contributions may be subsidized by consumers. Although we commend American Water for making charitable contributions, we are convinced that the cost of those contributions should be borne solely by its shareholders. To the extent that the holding in *Bell* requires a contrary conclusion, it is disapproved.

As indicated, nearly fifty years ago in *Bell* the Court ruled that the BPU should permit a utility to allocate a portion of its charitable contributions to operating expenses under limited circumstances. That ruling was based in part on *Peoples Gas Light & Coke Co. v. Slattery,* 373 *Ill.* 31, 25 *N.E.*2d 482 (1939), *appeal dismissed,* 309 *U.S.* 634, 60 *S.Ct.* 724, 84 *L.Ed.* 991 (1940). In that case, the Illinois Supreme Court stated that charitable contributions could be included in operating expenses so long as "it is shown that they will be of some peculiar benefit to the company or its patrons." *Id.* at 498.

The ruling in *Peoples Gas Light & Coke Co.* concerning charitable contributions was effectively overruled by the Illinois Supreme Court in *Illinois Bell Telephone Co. v. Illinois Commerce Commission*, 55 *Ill.*2d 461, 303 *N.E.*2d 364 (1973). There, the utility argued that its charitable contributions should be treated as operating expenses under *Peoples Gas Light & Coke Co. Id.* at 374. The court disagreed, stating that "the allowance of such contributions as operating expenses for purposes of ratemaking constitutes an involuntary assessment on the utility's patrons, and we question the propriety of [the utility's] being permitted to thus dispense largesse at their expense." *Id.* at 375. Thus, the court held that "such expenditures are not operating expenses cognizable for the purposes of ratemaking." *Ibid.*

A different court reasoned similarly in *Mississippi, ex rel. Allain v. Mississippi Public Service Commission*, 435 *So.*2d 608, 617 (Miss.1983). In that case, the Mississippi regulatory commission permitted the utility to treat its charitable contributions as operating expenses. In so doing, the state commission relied on a previous case in which the Mississippi Supreme Court had held that reasonable donations could be considered as operating expenses. *Ibid.* Reconsidering that issue "during this age of soaring costs[,]" the court concluded that "this item can no longer be justified as a proper operating expense of a utility." *Ibid.* Moreover, the court noted that "[w]e are cognizant of the importance of such contributions to the donees and the public relation benefits that result to the utility from such but[ ] nevertheless think in the present economy future customers should not be burdened with this cost, however small." *Ibid.*

That the legal foundation of *Bell*'s ruling has been eroded or repudiated during the past five decades is one factor that compels our disposition. We are also persuaded by the fact that forty states, either by statute, regulation, or case law, do not permit a utility's charitable contributions to be treated as an operating expense. Although we are not bound by those outside authorities, they inform our analysis of whether the BPU's current rule is

reasonable. For example, in *Alabama Power Co. v. Alabama Public Service Commission*, 359 *So.*2d 776, 780 (Ala.1978), the Alabama Supreme Court held that charitable contributions are not a proper operating expense for a utility. The Alabama Supreme Court explained that

> [w]hile the charitable contributions are commendable, we are not aware of any reason why the consumer should make the contribution as opposed to the investor. Logic tells us that charitable contributions are not an operating expense. The [utility], being a monopoly, can operate without deducting charitable donations as an operating expense.

*[Id.* at 779–80.]

The rationale expressed by the Alabama Supreme Court has been echoed by courts in other jurisdictions that have held that charitable contributions cannot be subsidized by ratepayers. In so holding, those courts have highlighted two interrelated themes. First, on general fairness grounds, ratepayers should not be forced to pay additional amounts for charitable purposes at the hand of a regulated monopoly. *See, e.g., Pac. Tel. & Tel. Co. v. Pub. Utils. Comm'n of Cal.*, 62 *Cal.*2d 634, 44 *Cal.Rptr.* 1, 401 *P.*2d 353, 374 (1965) (viewing inclusion of charitable contributions in operating expenses as involuntary levy on ratepayers who, because of monopolistic nature of utility service, are prevented from avoiding levy); *Wash. Gas Light Co. v. Pub. Serv. Comm'n of D.C.*, 450 *A.*2d 1187, 1231 (D.C.1982) (affirming ruling that " 'the ratepayers may not be required to make forced contributions' ") (citation omitted); *Ill. Bell Tel. Co., supra*, 303 *N.E.*2d at 375 (observing that "allowance of such contributions as operating expenses for purposes of ratemaking constitutes an involuntary assessment on the utility's patrons"); *Chesapeake & Potomac Tel. Co. of Md. v. Pub. Serv. Comm'n of Md.*, 230 *Md.* 395, 187 *A.*2d 475, 485 (1963) (declaring that "[i]f charitable contributions are allowed as an operating expense of a monopoly, [it] amounts to an involuntary levy on the rate payers"); *Cleveland Elec. Illuminating Co. v. Pub. Utils. Comm'n of Ohio*, 69 *Ohio St.*2d 258, 431 *N.E.*2d 683, 686 (1982) (stating that " '[r]atepayers should not be made involuntary donors to charitable and educational institutions through the payment of [ ] rates' ") (citations omitted).

Second, because a utility's charitable contributions are discretionary, they are more appropriately borne by the entity's shareholders, not its captive ratepayers. *See, e.g., Pac. Tel. & Tel. Co., supra,* 44 *Cal.Rptr.* 1, 401 *P.*2d at 374 (declaring that utility's "attempt to charge all of its own contributions as an operating expense to be borne by ratepayers is plainly unwarranted"); *S. Cent. Bell Tel. Co. v. Pub. Serv. Comm'n,* 702 *S.W.*2d 447, 452 (Ky.Ct.App.1985) (finding no error in determination that "charitable contributions are unnecessary expenses in providing utility services and that while the utility is free to make such contributions, the expense should be borne by the stockholders, not the ratepayers"); *Cent. Me. Power Co. v. Pub. Utils. Comm'n,* 153 *Me.* 228, 136 *A.*2d 726, 731 (1957) (stating that utility is not compelled to "give its money to charities, no matter how deserving"); *Chesapeake & Potomac Tel. Co. of Md., supra,* 187 *A.*2d at 485 (noting that utilities should "bear the burden and not [ ] pass it on to the subscribers"); *Cleveland Elec. Illuminating Co., supra,* 431 *N.E.*2d at 685–86 (reasoning that "[t]he decision to make charitable contributions, in terms of amounts and the recipients, is a matter of personal choice [and thus when] the utility makes this decision, the ratepayer has no choice") (footnote omitted); *Carey v. Corp. Comm'n of Okla.,* 168 *Okla.* 487, 33 *P.*2d 788, 794 (1934) (explaining that if utility "desires to take part of its earnings, just as would an individual, and contribute them to a worthy public cause, it may do so; but we do not feel that it should be allowed to increase its earnings to take care thereof").

American Water stresses that the contributions are relatively small and thus an insignificant burden to ratepayers. However, the impact of the BPU's policy is not confined to this one petition. Under the BPU's policy, other utilities making charitable contributions are permitted to include one-half of their cost in operating expenses and in so doing, pass that cost on to the consumer. Thus, the average ratepayer may be forced to pay an additional amount for charitable contributions in other settings.

In the last analysis, this case implicates equitable principles far more significant to ratepayers than the extra cents reflected on their water bills. Beyond those mere monetary amounts, the Court also must consider the inherent unfairness to the rate-paying public that results from treating a utility's charitable contributions as an operating expense. As recognized by other courts that have set aside such characterizations, forcing captive ratepayers to finance a utility's charitable contributions is inequitable because those costs are more appropriately borne by share-holders. Shareholders have the option of selling their shares if they are unhappy with the utility's charitable contributions or if they disapprove of the recipients of the money.

In contrast, ratepayers have little recourse if they disagree with the beneficiaries of a utility's largesse. Moreover, a charitable contribution involves numerous personal choices, namely, whether to make it in the first instance and, if so, to whom and in what amount. Requiring ratepayers to subsidize such contributions under those circumstances is unreasonable. We also agree with those courts that have concluded that charitable giving itself is unrelated to a utility's core function.

As noted, an agency's administrative action is presump-tively valid. *In re Pub. Serv. Elec. & Gas Co.'s Rate Unbundling, supra,* 167 *N.J.* at 384–85, 771 *A.*2d 1163. That deferential standard, however, is lessened in this case because the disputed policy does not involve the BPU's area of expertise. See *Close v. Kordulak Bros.,* 44 *N.J.* 589, 599, 210 *A.*2d 753 (1965) (stating that courts give "due regard [ ] to the agency's expertise where such expertise is a pertinent factor"). We find nothing in the text of Title 48 to indicate that the Legislature contemplated that the BPU would evaluate the appropriateness of a utility's charitable giving in the course of determining just and reasonable rates.

We acknowledge that a number of worthy beneficiaries, *i.e.,* fire departments, schools, churches, and medical organizations, have received money from American Water. We do not doubt the salutary purposes of those entities, but we are not persuaded that

a contribution to those donees enables the utility to "furnish safe, adequate and proper service[.]" *N.J.S.A.* 48:2–23. As noted, the BPU conceded in 1993 when it adopted the $^5\!/_0$ sharing policy that "[a]rguably, these contributions are not indispensable to providing service to customers." *In re Jersey Cent. Power & Light Co. Rate Application, supra,* 94 *N.J.A.R.*2d (Vol.8) at 53. The BPU also admitted that ratepayers "have no say as to whether to contribute, how much to contribute or to what agencies contributions should be made." *Ibid.*

Nor does the deferential standard of review require the Court to ignore the lack of evidence supporting the BPU's decision. The BPU's April 6, 1999, order is barren of any analysis that might indicate a connection between the utility's specific contributions and a measurable benefit to its ratepayers. We are satisfied that the effects of a utility's charitable gifts as asserted by the BPU, for example, better bill paying by ratepayers, are too abstract and attenuated to justify continued application of its $^5\!/_0$ sharing policy. Similarly, the BPU has cited no fact or proof in the record to support its general contention that there is a close nexus between a utility's contributions and the claimed benefits to actual consumers. Accordingly, the BPU's policy is arbitrary and lacks an evidentiary basis both in its general formulation and as applied in this instance. See *In re Petition of Pub. Serv. Coordinated Transp., supra,* 5 *N.J.* at 225, 74 *A.*2d 580 (overturning agency's fare increase for public utility because it was "unsupported by the evidence and [ ], therefore, unreasonable and unlawful").

In sum, the BPU's $^5\!/_0$ sharing policy as reflected in its April 6, 1999, order is arbitrary, without foundation in the record, and thus unreasonable. We agree with the position espoused by BPU's predecessor agency prior to *Bell* that " 'in the determination of fair and reasonable rates, contributions and donations to charitable organizations are not a proper charge to operating expense.' " *Bell, supra,* 12 *N.J.* at 596, 97 *A.*2d 602 (citation omitted). The Court does not doubt American Water's generosity or the value of that generosity to its donees. We find, however, an insufficient

nexus between its contributions and the claimed benefits to rate-payers to justify their inclusion in the utility's rate petition. We agree also with those courts throughout the country that have ruled that such contributions are appropriately borne by share-holders, not ratepayers. Our holding neither prevents utilities from making charitable contributions nor is intended to discourage such charitable giving. Rather, we conclude simply that the mandate of Title 48 for just and reasonable rates precludes the captive ratepayer from subsidizing those costs.

In view of our disposition, we need not address the Rate-payer Advocate's constitutional objections to the contributions policy. We adhere to the principle that "courts should not reach constitutional questions unless necessary to the disposition of the litigation." *O'Keefe v. Passaic Valley Water Comm'n,* 132 *N.J.* 234, 240, 624 *A.2d* 578 (1993); *see also Donadio v. Cunningham,* 58 *N.J.* 309, 325–26, 277 *A.2d* 375 (1971) (emphasizing that "a court should not reach and determine a constitutional issue unless absolutely imperative in the disposition of the litigation"); *Green Township Educ. Ass'n v. Rowe,* 328 *N.J.Super.* 525, 531, 746 *A.2d* 499 (App.Div.2000) (stating that courts "abhor deciding questions in advance of constitutional necessity").

## IV.

The judgment of the Appellate Division is reversed.

LaVECCHIA, J., dissenting.

I would affirm the judgment of the Appellate Division substan-tially for the reasons expressed in the thorough and thoughtful opinion of Judge Skillman. *In re Petition of New Jersey–Ameri-can Water Co.,* 333 *N.J.Super.* 398, 755 *A.2d* 1192 (2000). The panel correctly analyzed First Amendment jurisprudence and rejected the Ratepayer Advocate's broad claim that charitable giving by public utilities constitutes an impermissible compelled contribution to expressive activity. *Id.* at 409, 755 *A.2d* 1192.

In reversing the Appellate Division's judgment, the majority does not reach the First Amendment issue raised by the Ratepayer Advocate. Instead, the majority reverses exclusively on the basis that the Board of Public Utility's (BPU) policy that "permits a utility to include half of its charitable contributions as operating expenses for purposes of calculating its service rates," *ante* at 184, 777 *A*.2d at 48, is arbitrary, capricious, and unreasonable. Because the Court fails to accord the BPU's policy determination due respect under the appropriate standard of review, I respectfully dissent. I add only the following to the Appellate Division's sound opinion.

## I.

The Legislature has broadly delegated ratemaking authority to the BPU, authorizing the agency to approve rates so long as they are "just and reasonable." *N.J.S.A.* 48:2–21(d). Nearly fifty years ago, this Court in *New Jersey Bell Telephone Co. v. Board of Public Utility Commissioners,* 12 *N.J.* 568, 596–97, 97 *A*.2d 602 (1953), directed the BPU in the exercise of that authority by holding that the BPU must allow a public utility to include some charitable contributions in its operating expenses used to determine rates charged to customers. Since then, the BPU has applied a long-standing policy of allowing public utilities to apportion part of their charitable contributions to operating expenses borne by ratepayers. That agency policy choice, allowing utilities to include some charitable contributions as operating expenses, has remained steadfast. Traditional principles of administrative law counsel that that reasonable policy choice receive deference. *In re Pub. Serv. Elec. & Gas Co.'s Rate Unbundling, Stranded Costs & Restructuring Filings,* 167 *N.J.* 377, 384–85, 771 *A*.2d 1163 (2001); *In re Petition of Jersey Cent. Power & Light Co.,* 85 *N.J.* 520, 527, 428 *A*.2d 498 (1982).

The Court is apparently "persuaded by the fact that forty states, either by statute, regulation, or case law, do not permit a utility's charitable contributions to be treated as an operating

expense." *Ante* at 192, 777 *A.*2d at 53. By indiscriminately grouping together statutory, regulatory, and judicial disallowances of public utility charitable contributions, the majority overlooks a fundamental distinction relating to the respective institutional roles that were involved in those determinations. As the Appellate Division stated:

> Although a majority of other states do not allow public utilities to treat charitable contributions as operating expenses, a minority do allow public utilities to include at least a portion of their charitable contributions in operating expenses. Furthermore, the states that prohibit public utilities from claiming charitable contributions as operating expenses generally consider the issue to be within the discretionary authority of the state's public utility commission. Thus, the case law relied upon by the Ratepayer Advocate simply shows that other state public utility commissions have made a different policy choice than the BPU concerning this issue.
>
> [*In re Petition of New Jersey–American Water Co., supra,* 333 *N.J.Super.* at 404, 755 *A.*2d 1192 (citations omitted).]

In nine of the ten cases from other jurisdictions that the Court cites, *ante* at 192–94, 777 *A.*2d at 52–54, the reviewing courts upheld the regulatory commission's decision, ruling that the commission reasonably exercised agency discretion in excluding such contributions from a utility's cost of service. *Ala. Power Co. v. Ala. Pub. Serv. Comm'n,* 359 *So.*2d 776, 780 (Ala.1978); *Pac. Tel. & Tel. Co. v. Pub. Utils. Comm'n of Cal.,* 62 *Cal.*2d 634, 44 *Cal.Rptr.* 1, 401 *P.*2d 353, 374 (1965); *Wash. Gas Light Co. v. Pub. Serv. Comm'n of D.C.,* 450 *A.*2d 1187, 1231 (D.C.1982); *Ill. Bell Tel. Co. v. Ill. Commerce Comm'n,* 55 *Ill.*2d 461, 303 *N.E.*2d 364, 375 (1973); *S. Cent. Bell Tel. Co. v. Pub. Serv. Comm'n,* 702 *S.W.*2d 447, 452 (Ky.Ct.App.1985); *Cent. Me. Power Co. v. Pub. Utils. Comm'n,* 153 *Me.* 228, 136 *A.*2d 726, 731 (1957); *Chesapeake & Potomac Tel. Co. of Md. v. Pub. Serv. Comm'n of Md.,* 230 *Md.* 395, 187 *A.*2d 475, 485 (1963); *Cleveland Elec. Illuminating Co. v. Pub. Utils. Comm'n of Ohio,* 69 *Ohio St.*2d 258, 431 *N.E.*2d 683, 686 (1982); *Carey v. Corp. Comm'n of Okla.,* 168 *Okla.* 487, 33 *P.*2d 788, 794 (1934). Thus, the majority largely relies on cases that respect the policy-making authority of a public-utility commission to support the majority's determination here to overturn the

BPU's policy concerning inclusion of fifty percent of American Water's charitable contributions in its operating expenses.

The Court simply reaches a different policy choice than the BPU concerning public utility charitable contributions, and then supplants the regulatory commission's decision on that issue. In my view, the agency determination easily satisfies the arbitrary, capricious, and unreasonable standard that applies in this setting. The BPU's order makes clear that the agency carefully considered and established the reasonableness of including a portion of a utility's charitable expenses through a series of rate cases spanning many years. Hardly arbitrary, the BPU's policy preference was fully articulated in its order below:

> In *JCP & L Rates,* the Board found that JCP & L's contributions to charitable organizations resulted in direct and indirect benefits to the Company's employees, customers, and communities in that such donations supported community service agencies used by JCP & L ratepayers and also universities and colleges located within or near the Company's service area. While acknowledging ratepayer benefits, the Board also recognized that ratepayers have no say as to whether to contribute, how much to contribute or to what agencies contributions should be made. (*Id.*) To balance these competing concerns the Board adopted a ⁵⁰⁄₀₀ sharing of charitable contributions in the JCP & L proceeding. (*Id.*).

> This Board continues to believe that charitable contributions by a public utility benefit ratepayers sufficiently to warrant some degree of rate recognition as an expense related to a utility's business operations. Indeed, a ⁵⁰⁄₀₀ sharing recognizes that a utility's customer benefit, either directly or indirectly, by virtue of contributions made to community funds, educational campaigns, and the like. Charitable contributions also enhance a utility's standing and good will in a community and therefore benefit shareholders. A ⁵⁰⁄₀₀ sharing policy properly balances ratepayer and stockholder interests.

Like the Appellate Division, I find the BPU decision to be well within the discretionary authority of the agency. The majority, on the other hand, finds "an insufficient nexus between [American Water's] contributions and the claimed benefits to ratepayers to justify their inclusion in the utility's rate petition." *Ante* at 196–97, 777 *A.*2d at 55. A better conception of the necessary nexus between charitable contributions and corporate benefit can be gleaned from this Court's landmark decision in *A.P. Smith Manufacturing Co. v. Barlow,* 13 *N.J.* 145, 98 *A.*2d 581 (1953), concluding that corporations are empowered legally to make charitable

contributions. In that decision, the Court re-defined the concept of legitimate corporate benefit in connection with charitable contributions. Kenneth J. Yerkes, Note, *Corporate Charitable Contributions: Expanding the Judicial Analysis in a Post–Economic Recovery Act World*, 58 *Ind. L.J.* 161, 175 n. 101 (1982). *A.P. Smith* did not "remove either the language of, or the need for, some corporate benefit in the contribution, although clearly the term was given a profoundly new meaning." *Id.* at 168, 98 *A.2d* 581.

The Court determined that "more and more [corporations] have come to realize that their salvation rests upon sound economic and social environment[.]" *A.P. Smith, supra,* 13 *N.J.* at 154, 98 *A.2d* 581. Contributions to schools, churches, hospitals, and civic improvement funds, for examples, *id.* at 151, 98 *A.2d* 581, may "be readily justified as being for the benefit of the corporation; indeed, if need be the matter may be viewed strictly in terms of actual survival of the corporation in a free enterprise system." *Id.* at 154, 98 *A.2d* 581. Accordingly, farsighted corporations have sought through various types of contributions "to insure and strengthen the society which gives them existence and the means of aiding themselves and their fellows citizens." *Id.* at 161, 98 *A.2d* 581. Corporate charitable contributions manifest "enlightened self-interest" in that

corporate executives now take a long-term view of their companies' relationships with the rest of society. . . . [The corporate] benefit need not be immediate, direct, and tangible, and there need not be any explicit quid pro quo involved in corporate gifts. All that is necessary is an identifiable corporate benefit, be it deferred, indirect, and/or intangible.

[Hayden W. Smith, *If Not Corporate Philanthropy, Then What?*, 41 *N.Y. L. Sch. L.Rev.* 757, 763 (1997).]

Understanding the nature of corporate enlightened self-interest, the BPU's judgment appropriately recognized that the benefits of a public utility's charitable contributions inure to both ratepayer and shareholder. See Peter M. Sikora, Note, *Charitable Contributions of Public Utilities: Who Should Bear the Cost?*, 30 *Case W. Res. L.Rev.* 357, 373 (1980) (commenting that shared allocation of charitable contributions to both ratepayers and shareholders is

necessary for equitable treatment of those expenses because "any approach which places the burden on one group to the exclusion of the other ignores the only persuasive rationale for allocating such burdens—those who benefit should bear the burden"). The allocation of charitable costs to both ratepayers and shareholders reflects an equitable distribution of cost to benefit:

> If the ratepayers benefit from the contributions in the form of a better place in which to live and work, so too must the corporation and its shareholders benefit. It is quite probable that a community in which efforts succeed in making it more stable and attractive is likely to retain current residents and attract new ones—all of whom represent potential new subscribers to the utility's products and services. A growing customer base is generally a boon to any corporation and helps assure the continued value of the shareholders' investment. Similarly, other benefits, such as lower finance costs and decreased vandalism, would accrue to ratepayers, shareholders, and the company alike. While ratepayers can expect lower costs, shareholders and the company can expect a more valuable and more easily transferable investment.
>
> *[Ibid.]*

That corporations, such as American Water here, prefer local charities almost exclusively, confirms the notion that they seek a nexus between the contributions and strategic benefits to the organization. In requiring empirical-like proof of a close nexus between the charitable gift and ratepayer service, the majority misapprehends the nature of corporate giving generally and ignores the strategic benefits inherent in charitable contributions. The BPU policy choice is not only reasonable, but in my view it is preferable.

### III.

Accordingly, I would affirm the Appellate Division's judgment in this matter. The agency's policy choice did not constitute an abuse of discretion. Moreover, concerning the First Amendment challenge brought by the Ratepayer Advocate, I rely on the decision below with one additional comment.

A misinterpretation by the Ratepayer Advocate should be corrected. The Appellate Division "assume[d] that the BPU also would prohibit a public utility from making contributions to charities with ideological missions that are likely to be offensive to a

significant segment of the utility's ratepayers." 333 *N.J.Super.* at 412, 755 *A*.2d 1192. The Ratepayer Advocate mistakenly contends that the court "twists the constitutional concept of content neutrality into one of content acceptability and appoints the BPU as the arbiter of acceptability."

The Appellate Division's comment must be read in light of the clarity and correctness of the statements throughout its opinion concerning applicable First Amendment law. The court simply was restating the principle recognized earlier in its opinion—that compelled contributions to certain organizations violate First Amendment rights only when the funds are used to subsidize "political or ideological" activities. *Id.* at 409, 755 *A*.2d 1192. That standard, established by the United States Supreme Court, requires a content-based test insofar as activities having political or ideological content are distinguished from those activities that do not have such content. The Appellate Division opinion cannot fairly be read as suggesting that the BPU could make a content-based distinction *within* the category of ideological activities on the basis of "offensiveness." That the Appellate Division contemplated no differentiation among ideological activities is confirmed by the court's succeeding statement: "However, the mere specter that the management of some utility could make contributions to inappropriate charitable recipients should not foreclose the BPU from allowing utilities to treat a portion of their contributions to non-ideological charitable organizations that perform vital public services as operating expenses." *Id.* at 412, 755 *A*.2d 1192.

I would affirm the Appellate Division. Therefore, I respectfully dissent from the judgment of the Court.

*For reversal*—Chief Justice PORITZ and Justices STEIN, COLEMAN, LONG, VERNIERO and ZAZZALI—6.

*For affirmance*—Justice LaVECCHIA—1.